HOBSON, Acting Chief Judge.
Charlotte I. Gamble (hereinafter “Gamble”), respondent below, as guardian of the property of Cynthia Lee Gamble (hereinafter “the child”), appeals a final order awarding Ted L. Wells, Esquire (hereinafter “Wells”), petitioner below, whom Gamble employed in 1975 under a contingent fee contract on the child’s behalf, an attorney fee of $50,000 for services rendered which led to the passage of a 1980 legislative private relief act appropriating $150,000 to the child, but limiting her attorney fee to $10,000. Wells cross-appeals. We affirm in part, reverse in part, and remand.
On July 1, 1980, the Florida legislature enacted chapter 80-448, Laws of Florida, entitled, “An Act for the relief of Cynthia Leigh [sic] Gamble, a minor,” to compensate her for permanent physical and emotional injuries received due to the negligence of the Department of Health and Rehabilitative Services (HRS) while she was in HRS’ legal custody from 1967 to 1974.[1] The act, approved by Governor Bob Graham on July 2, 1980, appropriated $150,000 from the funds of the state treasury to compensate the child for her injuries, directed the Comptroller to draw a warrant in that amount in her favor to be applied to a trust fund to be administered by her legal guardian, but limited her attorney fee to $10,000.[2]
A bill to be entitled
An act for the relief of Cynthia Leigh [sic] Gamble, a minor; providing an appropriation to compensate her for personal injuries due to the negligence of the Department of Health and Rehabilitative Services; providing an effective date.
WHEREAS, on May 24, 1967, Cynthia Leigh [sic] Gamble, then 3 months old, was taken into the custody of the juvenile court of Hillsborough County and because she had no living parent was placed in the custody of the State Department of Public Welfare, and
WHEREAS, on August 6, 1967, Cynthia Gamble was admitted to Tampa General Hospital where it was discovered that she had several injuries, and
WHEREAS, on July 29, 1969, while still in the custody of the department, Cynthia Gamble was readmitted to the hospital suffering from a variety of illnesses and injuries, and
WHEREAS, on August 4, 1969, it was concluded that the child’s skeletal deficiencies and changes were the result of vitamin deficiency and trauma, and
WHEREAS, the child was placed in the home of a new foster mother and has since received adequate medical care at the Crippled Children’s Clinic to overcome the crippling and disfiguring injuries carelessly and negligently inflicted upon her while she was in the custody of the now Department of Health and Rehabilitative Services, and
The relevant facts leading to passage of the act are as follows: In January 1975 Gamble contacted Wells by telephone on the child’s behalf.[3] She told Wells that she had been granted legal custody by the juvenile court and that the child had been abused and injured while in the previous legal custody of HRS. Thereafter, Wells, a trial attorney emphasizing in personal injury cases, inspected the juvenile court’s records and verified that Gamble had legal custody. He also contacted HRS about the *176 possibility of obtaining its records, but realized when HRS refused to divulge them that nothing would be accomplished easily with HRS.
*175 WHEREAS, due to the negligence of the department, Cynthia Gamble has required plastic surgery and orthopedic operations and remains crippled and disfigured, NOW THEREFORE,
Be It Enacted by the Legislature of the State of Florida:
Section 1. The facts stated in the preamble of this act are found and declared to be true.
Section 2. The sum of $150,000 is appropriated from funds in the State Treasury to the credit of the Department of Health and Rehabilitative Services, not otherwise appropriated, to compensate Cynthia Leigh [sic] Gamble for personal injuries.
Section 3. The Comptroller is directed to draw his warrant in favor of Cynthia Leigh [sic] Gamble to be applied to a trust fund to be administered and accounted for by her legal guardian in the sum of $150,000 upon funds in the State Treasury to the credit of the Department of Health and Rehabilitative Services, and the State Treasurer is directed to pay the same out of such funds in the State Treasury not otherwise appropriated. The attorney’s fee for counsel of Cynthia Leigh [sic] Gamble shall be limited to $10,-000.
Section 4. This act shall take effect July . 1, 1980.
*176 On February 3, 1975, Gamble went to Wells’ law office. There, Wells presented her with a standard contingent fee contract entitled, “AUTHORITY TO REPRESENT.” He explained it to her, she appeared to read it, she signed it, and then he signed it.
AUTHORITY TO REPRESENT
I, the undersigned client, do hereby retain and employ, TED L. WELLS as my attorney to represent me in my claim for damages against_or any other person, firm or corporation liable therefore, resulting from an accident that occurred on the _ day of _, 19_
I hereby agree to pay for the cost of investigation, and should it be necessary to institute suit, the court costs. As compensation for his services, I agree to pay my said attorney, from the proceeds of recovery, the following fee:
33⅛% if settled without suit.
40% in the event suit is filed.
50% if an appeal is taken from the lower court by either side, or if garnishment or any proceeding after judgment has to be brought to collect the judgment or any portion thereof.
It is agreed and understood that this employment is upon a contingent fee basis, and if no recovery is made, I will not be indebted to my said attorney for any sum whatsoever as attorney’s fees. I agree that my attorney may pay my doctors’ bills from my share of the recovery.
DATED at Tampa, Fla., this 3 day of February, 1975.
CYNTHIA GAMBLE by:
/s/ “Mrs. Charlotte Gamble”
The above employment is hereby accepted upon the terms stated therein. BY: /s/ “Ted L. Wells”
According to Gamble, Wells told her that the blank spaces in the first paragraph of the document would be filled at a later time if the document was needed. Wells, however, explained that the blank spaces were not filled in because neither he nor Gamble knew the identity of the defendants) or the date(s) the child suffered her injuries.
Wells’ subsequent efforts to obtain access to the child’s HRS records in order to determine where, when and how she had been injured proved futile. On March 3,1975, he filed a motion in the juvenile court seeking to compel HRS to surrender its records for inspection by him. The court rendered an order on March 20, 1975, denying the motion on the ground that it lacked jurisdiction over HRS’ records. On May 12, 1975, Wells filed a petition for a writ of mandamus in the circuit court to direct HRS to release its records to him. The circuit court issued a writ on March 23, 1976, commanding HRS to surrender its records to him. HRS then appealed to us and we quashed the writ on December 16, 1976. See State v. Gamble, 339 So.2d 694 (Fla. 2d DCA 1976). On March 2, 1977, the Supreme Court of Florida denied Wells’ petition for a writ of certiorari. See Gamble v. State, 345 So.2d 422 (Fla.1977).
Thereafter, until November 1977, Wells wrote letters to the governor and other high state officials in an attempt to convince someone in a position of authority to direct HRS to open its records. However, his efforts were to no avail.
It finally became apparent to Wells that the only possible way of obtaining a recovery for the child would be by means of a private relief act. Thus, he telephoned Representative Richard Hodes’ office in November 1977 and requested an appointment for the purpose of convincing him to sponsor a claim bill. After meeting with Gamble and Wells in late November or early December 1977, Representative Hodes agreed to sponsor a bill.
During the 1978 legislative session, Representative Hodes introduced a claim bill calling for an award of $250,000 to the child but not containing any provision regarding an attorney fee. The bill was then referred to the House Judiciary Committee and, in *177 turn, to the claims subcommittee and, finally, to a special master.
The special master held full evidentiary hearings for the purpose of making findings of fact and recommendations regarding the bill. He ultimately filed a report during the 1979 legislative session with the claims subcommittee recommending approval of the bill but suggesting an award to the child of only $30,000. As to Wells’ fee, his report recommended:
ATTORNEY’S FEES: Attorney of claimant has agreed to reduce his fee on a contingency fee basis to twenty-five percent of the recovery. It is the opinion of the Special Master that this is reasonable for the time and work involved in pursuit of this claim.
On April 19, 1979, Wells went to Tallahassee for the purpose of attending the claims subcommittee hearing on the master’s report. During the course of the hearing, the following conversation transpired between Wells and Representative Hamilton Upchurch, the subcommittee chairman, concerning the attorney fee:
Q [By Representative Upchurch] Our special master found — indicated that you stated to him that you had your case on a contingent fee arrangement of twenty-five percent?
A [Wells] Yes.
Q That is what fee you are willing to take regardless of ...
A I am willing to take anything. The fee is of no consequence to me. I am perfectly willing to allow the committee to set anything they want to without any question.
Q Occasionally, we are asked that in the Judiciary Committee or on the floor, and we need to represent to those bodies what the fee arrangement is. A Certainly.
Q It is twenty-five percent of any amount collected?
A No, as I mentioned before we originally had this case with me as an attorney; had this case not as a claim bill, but as a personal injury case, and I have a standard contingent fee contract.
Q In the posture that it is now, what is your arrangement with your client, if you would care, to tell us (inaudible)
A Well, I don’t know that I can, it is perhaps, but it is a contingent standard fee contract, but again it is of no moment to me. I want you to understand that. Anything the committee wants to provide is all right.
Q We don’t set the fee but occasionally the question is asked by the Judiciary or on the floor.
A I see. The contract provides for thirty-three and a third percent out-of-court; forty percent in court; fifty percent with appellate proceedings.
Q Would I be accurately stating the case if I was asked that and I said that your fee was forty percent or would be forty percent or would it be twenty-five percent as found by the special master?
A Twenty-five percent, yes.
Q I can fairly and accurately represent that to the Legislature that your fee would be twenty-five percent of any amount allowed by the Legislature?
A Yes.
Q Ok, thank you. (Emphasis added)
Ultimately, the subcommittee recommended the bill but increased the award to the child to $50,000. The House of Representatives approved the bill but increased the award to $150,000. It also added a $10,000 attorney fee limitation provision. The bill, however, died in the 1979 session of the Senate.
Between the 1979 and 1980 legislative sessions, Wells lobbied heavily for the bill, sending letters and telegrams urging many legislators to support it.
The bill was reintroduced during the 1980 legislative session in the same form in which it had passed the 1979 House session.
After enactment of the bill, Wells learned of the $10,000 attorney fee limitation provi *178 sion. Later, upon receiving a state warrant for $150,000, he advised Gamble that he would not accept only $10,000 because he viewed the fee provision as unconstitutional. Gamble, however, refused to pay him more than $10,000. Thereafter, she retained other legal counsel per Wells’ advice. She still refused to pay him more than $10,000.
In September 1980 Wells filed a petition in the probate court for an attorney fee, costs and a charging lien, claiming in material part that the $150,000 award was the result of his five and one-half year performance under the contingent fee contract; that, under the terms of the contract, he was entitled to a fee based upon a percentage of the award, along with prejudgment interest; and that the portion of the act limiting his fee to $10,000 was an unconstitutional impairment of the obligations of the contract. Gamble, who had been appointed as the child’s legal guardian in August 1980, filed an answer and affirmative defenses in November 1980. She also demanded a trial by jury of all triable issues. On January 12, 1981, the court rendered an order granting Wells’ motion to strike her demand for a trial by jury. In July 1981 we denied without comment Gamble’s petition for a review of the order by writ of certiorari. See Gamble v. Sidwell, 402 So.2d 622 (Fla. 2d DCA 1981).
After trial, the probate court rendered a final judgment 1) awarding Wells a fee of $50,000 pursuant to the contractual provision calling for a fee of 33V3% in the event the case was settled without suit; 2) allowing $710.24 in costs; 3) impressing a charging lien in that total amount; and 4) denying prejudgment interest.
The court’s order observed in pertinent part:
When a lawyer is hired to do a job, under a contingent fee contract by one who is authorized to enter such employment contract on behalf of a minor, the contract is reasonable and necessary, and the lawyer does the job, he is entitled to be paid. Such is the case here. The minor’s next friend and legal custodian by court order, and who is now her adopted mother, entered into a standard contingent fee contract with Wells to find out who was responsible for multiple injuries sustained by the child, at various times, at unknown hands, and to recover compensation for the child. Wells worked 5½ years. His efforts resulted in recovery of $150,000.00 for the child. His contract called for one-third if no suit was filed. No damage suit was filed, although collateral suit and appeals were resorted to in exhausting legal remedies.
Wells finally got a claim bill passed through the legislature, which attempted to limit the attorney’s fee to $10,000.00. This is mere surplusage. The legislature cannot constitutionally impair the obligation of a valid contract.
At a subsequent hearing on Gamble’s motion for clarification, the court disavowed any intent to declare the attorney fee limitation provision unconstitutional. It reiterated that the provision was “mere surplus-age.”
Thereafter, Gamble filed an appeal and Wells filed a cross-appeal.
The meritorious contentions before us concern whether the contingent fee contract was enforceable; if it was enforceable, whether Wells waived his rights thereunder; if he did not waive his rights thereunder, whether the attorney fee limitation provision of the private relief act was a valid enactment in light of the constitutional prohibition against a law which impairs the obligations of a contract;[4] and, if it was an invalid enactment, whether it was properly severable from the other portions of the act.
Gamble asserts that the contract was unenforceable. For support, she presents two arguments: first, she claims that she lacked the requisite capacity to contract on the child’s behalf; second, she contends that the terms of the contract did not encompass the possibility of the parties obtaining a recovery by means of a private relief act.
*179 Capacity, of course, is vital to the existence and enforceability of a contract. Hogan v. Supreme Camp of the American Woodmen, 146 Fla. 413, 1 So.2d 256 (1941). Noting that a next friend of a minor has the power to act on a minor’s behalf, we held in Phillips v. Nationwide Mutual Insurance Co., 347 So.2d 465 (Fla. 2d DCA 1977), that a contingent fee contract entered into by a next friend on behalf of a minor for legal services will bind the minor if the trial court determines 1) that it was reasonably necessary to employ an attorney on the child’s behalf; and 2) that the contract was fair and reasonable when entered into. The court below indicated in its order that Gamble was the child’s “next friend and legal custodian by court order” when she entered into the contract. Implicit in its ruling is a dual finding 1) that it was reasonably necessary to retain an attorney on the child’s behalf; and 2) that the contract was fair and reasonable when entered into. Thus, we agree with the trial court that Gamble possessed the requisite capacity to enter into the contingent fee contract on the child’s behalf.
Gamble nevertheless maintains that she lacked the capacity to contract on the child’s behalf because the definition of “legal custody” at section 39.01(9), Florida Statutes (1975), does not expressly grant a legal custodian this authority. But this section specifically vests a legal custodian with the right and duty to protect and care for a dependent child. Further, chapter 39, which deals exclusively with juveniles, must be liberally interpreted and construed in conformity with its declared purposes. See § 39.001. Two of the declared purposes of this chapter (the only ones applicable under this factual setting) are 1) to assure that a dependent child receives the care which will conduce to his welfare, see section 39.001(2); and 2) to assure that a child removed from the control of his parent receives care as nearly equivalent to that which should have been given to the child by the parent. See § 39.001(3). In light of these considerations, we believe that it would be placing an unduly restrictive interpretation on the language of section 39.01(9) if we were to conclude that the legislature did not intend for a legal custodian to contract on a dependent child’s behalf in order to obtain needed relief for the child.
Gamble, who contemplated that we might endorse the trial court’s finding on the capacity issue, proposes next that the terms of the contract only covered the eventuality of the parties obtaining a recovery by means of a “claim for damages.” In other words, she submits that the court erred in reading the terms of the contract to encompass the possibility of the parties obtaining a recovery via a private relief act. However, the contract provided that the child would pay Wells a fee “from the proceeds of recovery” as “compensation for his services.” Further, there is ample evidence in the record to support the trial court’s determination that the parties intended for the language of the form contract to include the possibility of a recovery by means of a private relief act. Although Gamble testified otherwise, Wells testified that, prior to signing the contract, the parties foresaw the possibility of eventually obtaining relief via a claim bill. Moreover, the record shows that, subsequent to signing the contract, they did not engage in any further discussions regarding a fee arrangement. Also, they never filled in the blanks in the portion of the contract which mentioned a “claim for damages.” It is thus reasonable to conclude that they intended to treat this portion of the contract as surplusage.
In sum, given the operative language of the contract and the evidence regarding the parties’ conduct before and after the signing of the contract, the trial court did not err in deciding that they intended for the contract to cover the possibility that they would obtain a recovery by means of a private relief act.
The trial court, however, necessarily found that Wells did not waive his contractual rights in any way since it ordered that he be allowed to recover $50,000 of the $150,000 legislative appropriation pursuant to the clause in the contract which provided for a fee of 33Vs% in the event the case was *180 settled without suit. Gamble submits that Wells expressly waived all of his contractual rights during his conversation with Representative Upchurch at the subcommittee hearing on the special master’s report. We agree with her to an extent. A review of this colloquy clearly proves that Wells waived his contractual rights. Further, he never retracted the waiver. But Wells specifically qualified the waiver by holding out for 25% of whatever amount the legislature awarded the child. In sum, we conclude that the trial court’s finding that Wells did not waive his rights in any degree is not supported by substantial competent evidence.
Gamble submits in addition that Wells implicitly waived all of his contractual rights since he actively campaigned for passage of the act after the legislature’s insertion of the $10,000 fee limitation provision during the 1979 session. But the undisputed evidence reveals that Wells did not become aware of this fee provision until after the bill was signed into law. Regardless, he could not be charged with notice of this provision prior to the act’s effective date since a statute speaks from the time it takes effect. Dewberry v. Auto Owners Insurance Co., 363 So.2d 1077, 1080 (Fla. 1978).
Wells contends that the fee limitation provision violates the contract clauses of the federal and state constitutions in that it impairs his rights under the contract. Gamble, noting that constitutional provisions and statutes in existence at the time a contract is made become a part of the contract as if expressly incorporated therein, Shavers v. Duval County, 73 So.2d 684, 689 (Fla.1954),[5] argues that if she and Wells intended for the contract to encompass the possibility of a recovery by means of a private relief act, they must be deemed to have incorporated into the contract “a recognition that the legislature could not be bound by its contingent fee schedule”[6] since it has the “absolute authority”[7] under article VII, section 1(c), Florida Constitution, which antedated the contract in question, to determine the uses to which state funds may be spent. However, article VII, section 1(c), says no such thing. It simply states that “[n]o money shall be drawn from the treasury except in pursuance of appropriation made by law.”
To be sure, the Supreme Court of Florida recently remarked in Brown v. Firestone, 382 So.2d 654, 663 (Fla.1980), that “[t]he Florida legislature ... may attach qualifications or restrictions to the use of appropriated funds.” Brown, however, must be read in light of the facts. There, the court was discussing the legislature’s authority to place qualifications or restrictions on a general appropriations act which set aside funds for various state projects and institutions. This is a far cry from the situation at bar. Here, the legislature appropriated funds to a private citizen and then placed a restriction on the use of such funds which canceled that citizen’s qualified obligation under a valid contract.
In any event, we do not think that the court in Brown intended to convey the message that the legislature may attach qualifications or restrictions to the use of appropriated funds which conflict with constitutional safeguards. Indeed, the court remarked on an earlier day that the payment of funds from the state treasury may be made upon the conditions prescribed by statute “[w]hen not controlled by organic law.” State ex rel. Kennerly v. Amos, 78 Fla. 552, 83 So. 393, 394 (1919).
Thus, absent evidence indicating that the parties wished otherwise, we are unwilling to go so far as to accept the contention that the legislature could insert a provision within the private relief act which negated the child’s qualified obligation under the contingent fee contract.
The attorney fee limitation provision in question clearly conflicts with Wells’ qualified right under the contingent fee *181 contract to 25% of any recovery. Although the constitutional prohibition against impairing contracts is not absolute, Shavers v. Duval County, 73 So.2d 684 (Fla.1954), in Florida, virtually no degree of contract impairment is permissible. Yamaha Parts Distributors, Inc. v. Ehrman, 316 So.2d 557 (Fla.1975).
In order to determine how much impairment is tolerable in a particular case, the Supreme Court of Florida stated in Pomponio v. Claridge of Pompano Condominium, Inc., 378 So.2d 774 (Fla.1980), that “we must weigh the degree to which a party’s contract rights are statutorily impaired against both the source of authority under which the state purports to alter the contractual relationship and the evil which it seeks to remedy.” Id. at 780. (Emphasis added)
In this case, the “degree” to which the attorney fee provision impaired Wells’ qualified right under the contract was great. The provision restricted his fee to only $10,-000, despite the fact that he was entitled under his limited waiver to $37,500. The legislature’s “source” of authority under which it altered the contract stemmed from its plenary power to redress a moral obligation. It did not come from its inherent, broad power to regulate or police. Compare, Yellow Cab v. Dade County, 412 So.2d 395 (Fla. 3d DCA 1982); Johnson v. R.H. Donnelly Co., 402 So.2d 518 (Fla. 1st DCA 1981). The “evil” which the legislature sought to remedy was not an extensive economic or social problem. Indeed, a claim bill, by its very nature, is restricted to less than the general public. Dickinson v. Bradley, 298 So.2d 352 (Fla.1974). In sum, we believe that the degree of impairment outweighs the source of the authority and the evil sought to be remedied. Notwithstanding the trial court’s view that the fee provision was “mere surplusage,” we think that it must be characterized as unconstitutional.
The issue which remains is whether, as the trial court found, the clause limiting the attorney fee is properly severable from the other portions of the act. The Supreme Court of Florida in High Ridge Management Corp. v. State, 354 So.2d 377 (Fla. 1978), enunciated the formula to be applied in ascertaining whether an invalid portion of an act is severable from the remaining portions:
If an unconstitutional portion of an act can be logically excised from the remaining valid provisions without doing violence to the legislative purpose expressed in the valid portions, if such legislative purpose can be accomplished independently of the invalid provisions, if the act is complete in itself after striking the invalid provisions, and if the valid and invalid provisions are not so inseparable that the Legislature would not have enacted the one without the other, it is the duty of the Court to give effect to that portion of the statute which is not constitutionally infirm. Presbyterian Homes of Synod of Florida v. Wood, 297 So.2d 556 (Fla.1974); Small v. Sun Oil Company, 222 So.2d 196 (Fla.1969); Cramp v. Board of Public Instruction of Orange County, 137 So.2d 828 (Fla.1962).
Id. at 380.
The valid provisions of the act in question state that the child shall receive $150,000. With or without the unconstitutional attorney fee provision, she is entitled to receive $150,000. Thus, the legislative purpose expressed in the valid provisions can be accomplished absent the unconstitutional provision.
Accordingly, we affirm the portions of the trial court’s order striking the fee provision from the act and granting costs, reverse the portion awarding Wells a fee of $50,000 and remand with directions that the fee award be reduced to $37,500, without prejudgment interest. .
AFFIRMED in PART, REVERSED in PART, and REMANDED.
RYDER and SCHOONOVER, JJ., concur.

. The Department of Health and Rehabilitative Services was formerly known as the State Department of Public Welfare.

. The private relief act reads in full:

. Gamble and the child are not blood-related.

. See Art. I, § 10, U.S. Const.; Art. I, § 10, Fla. Const.

. See, e.g., Frizzell v. Bartley, 372 So.2d 1371 (Fla.1979).

. Gamble’s reply brief, p. 7.

.Id.