PERRY, J.,
dissenting.
I respectfully dissent. In my view, the challenged provisions of chapter 2011-68, Laws of Florida, amount to an insufferable and unconstitutional “bait and switch” at the expense of public employees who were members of the Florida Retirement System (FRS) prior to July 1, 2011.[8] I would affirm the trial court’s ruling and hold that the plain meaning of the preservation of rights statute is that state employees have a contractual right to a noncontributory retirement system that cannot be abridged; that this Court incorrectly determined otherwise in Florida Sheriffs Ass’n v. Department of Administration, 408 So.2d 1033 (Fla.1981), by misapplying the tenets of statutory construction and the law in this context; that we should therefore recede from Florida Sheriffs or, at the very least, distinguish and limit that case to its facts in accord with the trial court’s ruling below; and that the employees at issue in this case are entitled to reimbursement with interest of the funds deducted or withheld under the challenged provisions.
PLAIN MEANING OF THE PRESERVATION OF RIGHTS STATUTE
The preservation of rights statute has provided since its inception that
[ t]he rights of members of the retirement system established by this chapter shall not be impaired by virtue of the conversion of the Florida Retirement System to an employee noncontributory system. As of July 1,1974, the rights of members of the retirement system established by this chapter are declared to be of a contractual nature, entered into between the member and the state, and such rights shall be legally enforceable as valid contract rights and shall not be abridged in any way.
See § 121.011(3)(d), Fla. Stat. (1974); § 121.011(3)(d), Fla. Stat. (2012); ch. 74-302, § 1, at 937, Laws of Fla. The Legislature could not have been more clear. The statute’s plain meaning is that state employees have a contractual right to a noncontributory retirement system that cannot be abridged. See art. 1, § 10, Fla. Const. (“No ... law impairing the obligation of contracts shall be passed.”).
“[Wjhen the language of the statute is clear and unambiguous and conveys a clear *399 and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.” Atwater v. Kortum, 95 So.3d 85, 90 (Fla.2012) (quoting Holly v. Auld, 450 So.2d 217, 219 (Fla.1984)). “The best evidence of the intent of the legislature is generally the plain meaning of the statute.” In re Order on Prosecution of Criminal Appeals by the Tenth Judicial Circuit Pub. Defender, 561 So.2d 1130, 1137 (Fla.1990). Without even mentioning the plain meaning rule, this Court in Florida Sheriffs stated to the contrary that “to best understand the intent of the legislature,” it was necessary to fully discuss the “considerable Florida case law which established basic legal guidelines for governmental retirement systems in the state” that existed “[pjrior to the statutory enactment of the preservation of rights provision in 1974.” 408 So.2d at 1035.
After improperly considering that case law, the Court in Florida Sheriffs held that the preservation of rights statute “vests all rights and benefits already earned under the present retirement plan so that the legislature may now only alter retirement benefits prospectively,” and that the statute “was not intended to bind future legislatures from prospectively altering benefits which accrue for future state service.” Id. at 1037 (emphasis in original). In so doing, the Court violated the plain meaning rule and read into the preservation of rights statute words and concepts that simply are not there. The present majority repeats and compounds this error.
MISAPPLICATION OF LAW
The Court in Florida Sheriffs erroneously buttressed its flawed holding by stating that “[tjo hold otherwise would mean that no future legislature could in any way alter future benefits of active employees for future services, except in a manner favorable to the employee. This view would, in effect, impose on the state the permanent responsibility for maintaining a retirement plan which could never be amended or repealed irrespective of the fiscal condition of this state.” 408 So.2d at 1037. That is a misstatement of the law. As recognized by the present majority, where, as here, the contract at issue is with a governmental entity, “an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose.” Majority op. at 385 (quoting U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 25, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)).
This is the test that the Court in Florida Sheriffs should have applied, but it failed to do so. By way of contrast, this Court properly applied this test in Chiles v. United Faculty of Florida, 615 So.2d 671, 673 (Fla.1993), recognizing that, while severely limited, the Legislature has the “authority to change the law to eliminate a contractual obligation it has itself created” and “must be given some leeway to deal with bona fide emergencies.” Citing U.S. Trust, this Court held that,
[ bjefore that authority can be exercised, ... the legislature must demonstrate no other reasonable alternative means of preserving its contract with public workers, either in whole or in part. The mere fact that it is politically more expedient to eliminate all or part of the contracted funds is not in itself a compelling reason. Rather, the legislature must demonstrate that the funds are available from no other possible reasonable source.
Id. Properly applying this test in Florida Sheriffs would have surely led this Court to conclude that the statute at issue in that case unconstitutionally impaired state em *400 ployees’ contract rights created by the preservation of rights statute.
In short, the Court in Florida Sheriffs applied the wrong tenets of statutory construction and the wrong legal test to reach the wrong result. I would therefore recede from Florida Sheriffs.
TRIAL COURT’S RULING
Alternatively, and at the very least, I would find Florida Sheriffs to be distinguishable and limited to its facts. In that vein, I agree with Circuit Court Judge Jackie L. Fulford’s ruling on this issue, which I find to be correct and deserving of recitation here:
The parties agree that any analysis of this issue must begin with the Florida Supreme Court’s opinion in Florida Sheriffs Association v. Department of Administration, 408 So.2d 1038 (Fla.1981). Sheriffs involved a special risk credit for a certain limited number of FRS members. The special risk credit was a benefit earned through years of service. The legislature increased the credit from 2% to 3% of the employee’s monthly income and then returned the credit to 2%. Based upon the facts before it, the Florida Supreme Court found that the legislature did not impair its contract with FRS members by returning the credit to 2% because the contract created by section 121.011(3)(d) did not preclude the legislature from “altering benefits which accrue for future state service.” Id. at 1037.
The defendants contend that the Sheriffs case governs the present case and requires that summary judgment be entered in their favor. The plaintiffs contend that Sheriffs does not address the issues raised in this case. This Court finds that the facts upon which the Sheriffs decision was based differ substantially from the facts of this case. Unlike the special risk credit at issue in Sheriffs, the changes imposed by Senate Bill 2100 are not benefits which accrue for future state service. The changes at issue here, a complete change of the plan from a noncontributory to a contributory plan, and the elimination of entitlement to a cost-of-living adjustment, are qualitative changes to the plan, not changes to individual components of future accruals within the plan. FRS members have had continuous, unconditional rights to a noncontributory plan with a cost-of-living adjustment since the inception of FRS; these elements are not related to future state service. Because the Sheriffs case did not reach or contemplate changes such as these, this Court is bound to follow the express language of section 121.011(3)(d), Florida Statutes. This provision cannot be read as allowing the legislature to redefine established, unconditional ■ contractual rights under Chapter 121 as suddenly tied to years of service and thereby altogether eliminated in the future. Such a reading would render the express contract created by section 121.011(3)(d) wholly illusory.
While Sheriffs does authorize the legislature to make prospective alterations to benefits which accrue for future state service within the “mandatory, noncontributory retirement plan,” absolutely nothing in it can be read as authorizing the legislature to change the fundamental nature of the plan itself. The legislature is precluded by section 121.011(3)(d), Florida Statutes, from “abridg[ing] in any way” the unconditional contract rights of the plaintiffs. The changes challenged in this case plainly abridge the plaintiffs’ unconditional contract rights to a noncontributory retirement plan that includes a cost-of-living adjustment. Although defendants contend that this reading of sec *401 tion 121.011(3)(d) improperly allows one legislature to bind the hands of future legislatures, Florida law is clear that a legislature can, as part of its power to contract, authorize a contract that grants vested rights which a future legislature cannot impair. State v. Gadsden County, 229 So.2d 587 (Fla.1969). The Florida Legislature clearly did so when it adopted section 121.011(3)(d), Florida Statutes.
This Court’s determination that Senate Bill 2100 impairs plaintiffs’ contract with the state does not end its impairment inquiry. For an impairment of contract to be unconstitutional, it also must be substantial. U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 19-21, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); see also Pomponio v. Claridge of Pompano Condo., 378 So.2d 774, 779-80 (Fla.1980) (adopting approach to contract clause analysis similar to United States Supreme Court). The unrebutted evidence presented by the plaintiffs through their expert Charlette Moore demonstrates the substantiality of impairment at issue in this case. The costs of the changes to the individual plaintiffs range from $12,445.81 to $329,683.56 over the span of their working years and retirement if they receive no further salary raises. The costs increase if their salaries increase. The elimination of the future cost-of-living adjustment alone will result in a 4 to 24% reduction in the plaintiffs’ total retirement income. These costs are substantial as a matter of law. See Oregon State Police Officers’ Ass’n v. State, 323 Or. 356, 918 P.2d 765 (Or.1996); Calabro v. City of Omaha, 247 Neb. 955, 531 N.W.2d 541 (Neb.1995); Booth v. Sims, 193 W.Va. 323, 456 S.E.2d 167 (W.Va.1995). The defendants’ attempt to characterize the detrimental effects to plaintiffs as insubstantial are unavailing and without legal support.
The final step of the impairment analysis is a determination of whether the impairment is both reasonable and necessary to serve an important public purpose. U.S. Trust, 431 U.S. at 25 [97 S.Ct. 1505]. The Florida Supreme Court directs that in order for the state to justify impairment of its contractual obligations, it must demonstrate a “compelling state interest.” Chiles v. United Faculty of Fla., 615 So.2d 671, 673 (Fla.1993). This requires a showing that there was “no other reasonable alternative means of preserving its contract with public workers, either in whole or in part.... that the funds are available from no other [possible] reasonable source.” Id.
Defendants failed to meet this burden. They merely produced evidence that the state faced a significant budget shortfall; this is not enough. Although ordinarily courts give deference to the legislature regarding its policy determinations, where the state violates its own contract, “complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State’s self-interest is at stake.” U.S. Trust, 431 U.S. at 26 [97 S.Ct. 1505], The undisputed record indicates that other reasonable alternatives existed to preserve the state’s contract with FRS members: Senate Bill 2100 significantly reduced employer contributions to the FRS, and the legislature preserved $1.2 billion in unspent general revenue funds for the 2011-12 fiscal year. All indications are that the Florida Legislature chose to effectuate the challenged provisions of Senate Bill 2100 in order to make funds available for other purposes. This constitutes an unconstitutional impairment of plaintiffs’ contract, for “[i]f a State could reduce its financial obli *402 gations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.” Id.
Williams v. Scott, 19 Fla. L. Weekly Supp. 475b, 477, 2012 WL 1379453 (Fla.2d Cir. Ct. Mar. 6, 2012) (emphasis in original). I further agree with Judge Fulford’s conclusion that the proper remedy is for the State “to reimburse with interest the funds deducted or withheld, pursuant to the challenged provisions ... from the compensation or cost-of-living adjustments [of] employees who were members of the FRS prior to July 1, 2011.” Id. at 478.
LEWIS and QUINCE, JJ., concur.

. This is not the case with public employees who became members of the Florida Retirement System after July 1, 2011, as they did not have a contract with the State before the effective date of the new law.