650 So.2d 128 (1995)
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a foreign corporation, Appellant,
v.
Diane S. HASSEN and Thomas S. Hassen, Appellees.
No. 94-01241.
District Court of Appeal of Florida, Second District.
February 1, 1995.
*130 H. Shelton Philips, Kaleel & Kaleel, P.A., St. Petersburg, for appellant.
Diana L. Myers, Perenich, Carroll, Perenich, Avril & Caulfield, P.A., Clearwater, for appellees.
LAZZARA, Judge.
State Farm Mutual Automobile Insurance Company (State Farm) appeals a partial final summary judgment entered in a declaratory judgment action brought by Diane and Thomas Hassen (the Hassens) in which the trial court determined that the Hassens were entitled to uninsured motorist coverage under an automobile insurance policy issued by State Farm. We have jurisdiction. Insurance Co. of North America v. Querns, 562 So.2d 365 (Fla. 2d DCA 1990); Fla.R.App.P. 9.110(k). Because we agree with State Farm's contention that the trial court constitutionally erred by applying the provisions of section 627.727(6), Florida Statutes (Supp. 1992), to the Hassens' claim, we reverse and remand for further proceedings. We also certify a two-part question of great public importance regarding whether the statute is constitutional and, if so, whether it can be applied constitutionally to a pending claim brought under an insurance policy executed prior to the statute's effective date.

I. FACTUAL BACKGROUND
On June 15, 1990, Mrs. Hassen sustained injuries in an automobile accident as a result of the alleged negligence of another driver, Chad Carlton. At the time of the accident, State Farm insured both her and her husband under an automobile insurance policy with an effective renewal date of March 26, 1990. The policy provided "stacked" uninsured motorist benefits of $200,000.
The owner of the automobile driven by Mr. Carlton, William Buttmi, was insured through UniSun Insurance Company (UniSun) with a policy providing liability limits of $100,000. UniSun offered to settle the third party claim for the full amount of its policy limits. The Hassens accepted the offer subject to the approval of State Farm. They then sent State Farm a certified letter formally notifying it of UniSun's offer and requesting authorization to accept the offer. The letter further stated that "[s]hould [State Farm] choose to preserve its subrogation rights by refusing permission to settle, kindly forward a check in the amount of $100,000.00."
Correspondence followed in which State Farm, although making settlement overtures, questioned whether the value of the Hassens' third party claim was worth UniSun's policy limits. State Farm also stated that it had reason to believe that Mr. Buttmi may have sufficient assets to contribute to a settlement or to satisfy its subrogation claim because of his ownership in two construction companies and his recent inheritance from a deceased family member.[1] State Farm further advised that it had been in contact with Mr. Buttmi to determine if he would contribute to the settlement and that it would not make a decision on authorization to settle the third party claim until he responded. The record does not reflect whether Mr. Buttmi ever responded to State Farm's inquiry.
State Farm did, however, offer to settle the Hassens' uninsured motorist claim for $50,000 but without waiving its subrogation rights. Thus, its ultimate response was to deny permission to settle, to refuse to waive *131 its subrogation rights, and to decline to pay the sum previously offered by the third party liability carrier, UniSun.
The Hassens, over State Farm's objection, then proceeded to finalize UniSun's settlement offer by accepting the full amount of the policy limits and by executing a full release in favor of the tortfeasors. Their motivation for doing so was based on an immediate financial need for the settlement money. The Hassens later demanded coverage from State Farm under the uninsured motorist provisions of their policy. State Farm denied coverage because of the unauthorized settlement, resulting in the Hassens' seeking a declaration of their rights under their policy and Florida law as to the existence of uninsured motorist coverage.

II. PROCEDURAL BACKGROUND
In determining coverage by way of summary judgment, the trial court ruled that section 627.727(6), Florida Statutes (Supp. 1992), which had an effective date of October 1, 1992,[2] was a "remedial/procedural statute and applie[d], therefore, to claims for uninsured motorist benefits and policies of insurance issued before its effective date." The trial court then found that (1) the Hassens complied with the statute by giving State Farm "ample notice and opportunity to tender the sum offered by the tortfeasors in order to retain subrogation rights" and (2) that State Farm "failed to timely waive subrogation or tender the amount of the written offer." It thus concluded that under the statute the Hassens "were free to settle and release the tortfeasors without prejudice to their claim for underinsured motorist benefits from Defendant, STATE FARM."

III. STATUTORY/CONTRACTUAL BACKGROUND AND ANALYSIS
On the effective date of the policy at issue, section 627.727(6), Florida Statutes (1989), governed the respective rights and obligations of the parties in the event the Hassens presented State Farm with a proposed settlement agreement from an uninsured motorist's liability insurance carrier. Under this version of the statute, State Farm had thirty days from receipt of the agreement to approve the settlement, waive its subrogation rights, authorize a full release, and agree to arbitrate the uninsured motorist claim. If it did not abide by these conditions, the only consequence it faced was a lawsuit brought by the Hassens against it and the uninsured motorist "to resolve their respective liabilities for any damages to be awarded" the Hassens. Additionally, the statute provided that "[a]ny award in such action against the liability insurer's insured [would be] binding and conclusive as to the [Hassens] and [State Farm's] liability for damages up to its coverage limits." The statute also required that "in such action, the liability insurer's coverage must first be exhausted before any award [could] be entered against [State Farm], and any such award against [State Farm] [would] be excess and subject to the provisions of subsection (1)."[3] The statute, however, placed no advance payment obligation on State Farm's right to preserve its subrogation rights against the uninsured motorist if it refused to approve the settlement offer.
Significantly, the parties recognized the 1989 statute's requirements and limitations by incorporating its terms in the uninsured motorist provisions of their policy. They specifically agreed that if State Farm, within thirty days of receiving a tortfeasor's settlement *132 agreement from the Hassens, did not approve the settlement, waive its right of recovery against the tortfeasor, authorize a full release, and agree to arbitrate the uninsured motorist claim, then the Hassens could file a lawsuit against State Farm and the tortfeasor. The purpose of the lawsuit would be to decide "a. if the [Hassens are] legally entitled to collect damages; and b. if so, how much?" The policy also provided that the tortfeasor's liability limits for bodily injury "shall be exhausted before any award may be entered against [State Farm]. The award against [State Farm] shall be binding and conclusive on [State Farm] and the [Hassens] up to [State Farm's] coverage limit."
Furthermore, as clearly contemplated by the parties under their contract, State Farm's obligation to pay uninsured motorist benefits was to be reduced by "the total of the bodily injury limits of liability of all other vehicle liability policies ... that apply to any person or organization legally liable for such bodily injury." They agreed, therefore, that State Farm's uninsured motorist coverage would be "excess over, but shall not duplicate any amount paid to or for the [Hassens] by or for any person or organization who is or may be held legally liable for the bodily injury to the [Hassens]."
Because the parties obviously incorporated the provisions of the 1989 statute into the insurance contract, we presume that they entered into the contract with reference to this specific statute so that its provisions became an integral part of the contract. Grant v. State Farm Fire & Casualty Co., 638 So.2d 936 (Fla. 1994).
Under one clause of the uninsured motorist provisions of the policy, the Hassens and State Farm also clearly and unambiguously agreed that:
The insured shall not enter into any settlement with any person or organization legally liable for the insured's bodily injury without our written consent if the settlement agreement precludes our right of recovery against such person or organization.
They then agreed, consistent with this clause, that there would be no uninsured motorist coverage "for any insured who, without [State Farm's] written consent, settles with any person or organization who may be liable for the bodily injury." The obvious intent of these provisions were twofold.
First, they were designed to preserve State Farm's well-established right under Florida law, consistent with public policy, to be subrogated to any right of action which the Hassens may have had against third persons who caused them bodily injury. Schwab v. Town of Davie, 492 So.2d 708 (Fla. 4th DCA 1986). This right is based on the premise that an insurance contract is a business undertaking not founded on principles of philanthropy or charity. State v. De Witt C. Jones Co., 108 Fla. 613, 147 So. 230 (1933). Thus, "[a]fter an insurance company has paid a loss on behalf of the insured, it is entitled to subrogation either by express contract rights, or by equitable subrogation by operation of law." Hough v. Huffman, 555 So.2d 942, 945 (Fla. 5th DCA), approved, 564 So.2d 1081, 1082 (Fla. 1990). Second, these provisions were intended to prevent the Hassens from unilaterally extinguishing this right without State Farm's consent because, under the law, "if one who sustains loss as a result of negligence or wrongdoing of another releases the tortfeasor, an insurer subrogated to the right of the injured party is barred by that release." High v. General American Life Ins. Co., 619 So.2d 459, 461 (Fla. 4th DCA), review denied, 629 So.2d 133 (Fla. 1993). Significantly, the provisions of the contract, just like the 1989 statute, imposed no prepayment obligation on State Farm in order to preserve its right of recovery against a tortfeasor.
In 1992, however, the legislature clearly manifested its intent to substantially revise the subrogation rights of an uninsured motorist carrier under section 627.727(6) by imposing a new prepayment obligation on such a carrier if it chooses to preserve those rights.[4] Under paragraph (a) of the revised *133 statute, the carrier still has thirty days to consider authorization of a settlement or retention of subrogation rights. However, if it fails to respond as required by paragraph (b), then "the injured party may proceed to execute a full release in favor of the underinsured motorist's liability insurer and its insured and finalize the proposed settlement without prejudice to any underinsured motorist claim." Paragraph (b) then provides that:
If an underinsured motorist insurer chooses to preserve its subrogation rights by refusing permission to settle, the underinsured motorist insurer must, within 30 days after receipt of the notice of the proposed settlement, pay to the injured party the amount of the written offer from the underinsured motorist's liability insurer. Thereafter, upon final resolution of the underinsured motorist claim, the underinsured motorist insurer is entitled to seek subrogation rights against the underinsured motorist and the liability insurer for the amounts paid to the injured party. (Emphasis added.)[5]
Thus, unlike the 1989 statute, the revised statute imposes an advance payment obligation on an uninsured motorist carrier in order to preserve its legally recognized right to subrogation. Additionally, even though the carrier is then entitled to recoup this payment by means of a subrogation claim, the practical effect of this new obligation is to require the carrier to make an immediate award to its insured prior to the determination of any liability for damages and the exhaustion of the uninsured motorist's liability insurance coverage.
It is obvious from this analysis that the legislative purpose for the 1992 revision of section 627.727(6) was to address the situation in which an injured party was denied immediate access to needed compensation from a tortfeasor's liability carrier because the injured party's uninsured motorist carrier refused to approve a settlement offer and waive its subrogation rights. Thus, the legislature, through this revision, shifted the financial burden from the injured party to the uninsured motorist carrier by mandating that the carrier immediately pay over to its insured the full amount of the tortfeasor's liability carrier's settlement offer, irrespective of any determination of liability, as a condition of preserving subrogation rights.[6]

IV. CONSTITUTIONAL ANALYSIS: IMPAIRMENT OF CONTRACT
Against this background, we begin our resolution of this case by noting that the jurisprudence of this state has long recognized that in the absence of an explicit legislative expression, a substantive law is to be applied prospectively. Young v. Altenhaus, 472 So.2d 1152 (Fla. 1985). "This rule mandates that statutes that interfere with vested rights will not be given retroactive effect." 472 So.2d at 1154. Although retroactive application of a statute is not necessarily invalid, it becomes so "in those cases wherein vested rights are adversely affected or destroyed or when a new obligation or duty is created or imposed, or an additional disability is established, in connection with transactions or considerations previously had or expiated." McCord v. Smith, 43 So.2d 704, 709 (Fla. 1949).
*134 It has also been the long established law of this state that a statute contravenes the constitutional prohibition against impairment of contracts when it has "the effect of rewriting antecedent contracts, that is, of changing the substantive rights of the parties to existing contracts." Manning v. Travelers Ins. Co., 250 So.2d 872, 874 (Fla. 1971). The polestar of any analysis of whether a statute constitutionally impairs an existing contract is the fundamental principle that essentially no degree of impairment will be tolerated, no matter how laudable the underlying public policy considerations of the statute may be. Pomponio v. Claridge of Pompano Condominium, Inc., 378 So.2d 774 (Fla. 1979). See also Sarasota County v. Andrews, 573 So.2d 113, 115 (Fla. 2d DCA 1991) (Pomponio "specifies that the bedrock of its analysis is the principle that virtually no degree of impairment will be allowed.") (emphasis in original). Thus, in order to prevent the impairment of an insurance contract, Florida law generally requires that "the statute in effect at the time the insurance contract is executed governs any issues arising under that contract." Lumbermans Mut. Casualty Co. v. Ceballos, 440 So.2d 612, 613 (Fla. 3d DCA 1983). See also Metropolitan Property & Liab. Ins. Co. v. Gray, 446 So.2d 216, 218 (Fla. 5th DCA 1984), approved, 478 So.2d 25 (Fla. 1985) ("[S]tatutory changes occurring between renewals cannot be incorporated into [an insurance] policy without unconstitutionally impairing the obligations of the parties to the insurance contract.").
Measured against these time-honored principles, we conclude that the application of section 627.727(6), Florida Statutes (Supp. 1992), to a pending claim brought under the uninsured motorist provisions of an automobile insurance policy executed prior to its effective date would unconstitutionally impair the obligation of that contract in violation of article I, section 10, of the Florida Constitution, which prohibits the enactment of any "law impairing the obligation of contracts." See Yamaha Parts Distrib., Inc. v. Ehrman, 316 So.2d 557 (Fla. 1975). Our conclusion is based on the following analysis.
We initially observe that the legislature clearly expressed its intent regarding the effective date of the act amending section 627.727(6) by providing "[e]xcept as otherwise provided herein, this act shall take effect October 1, 1992." Ch. 92-318, § 17 [sic], at 3178, Laws of Fla. Moreover, our review of this enabling legislation reveals nothing in its language manifesting any intention by the legislature that the specific amendments to subsection (6) were to be applied retroactively. Larson v. Independent Life & Accident Ins. Co., 158 Fla. 623, 29 So.2d 448 (1947).
Conversely, however, the legislature clearly manifested its intent that the amendment to section 627.727 creating subsection (10) was remedial and was to be given retroactive effect. Ch. 92-318, § 80, at 3151, Laws of Fla.; State Farm Mut. Auto. Ins. Co. v. LaForet, 632 So.2d 608 (Fla. 4th DCA 1993). Thus, had the legislature intended that amended subsection (6) was to be classified as remedial and was to be applied retroactively, it would have said so, as it did with regard to subsection (10).[7] Accordingly, we presume that the legislature did not intend subsection (6), as amended, to apply to pre-existing insurance contracts. See Fleeman v. Case, 342 So.2d 815 (Fla. 1976).
Even in the face of this well-founded presumption, however, the Hassens strongly urge us to conclude that the 1992 statute is remedial in nature and thus can be constitutionally applied to a pending claim. See, e.g., City of Orlando v. Desjardins, 493 So.2d 1027 (Fla. 1986). They contend that the statute does nothing more than change the "road map" by which an uninsured motorist carrier enforces its right of subrogation. We reject this contention because, in our view, the statute substantively changes the "rules of the road" regarding the law governing uninsured motorist coverage. See generally Alamo *135 Rent-A-Car, Inc. v. Mancusi, 632 So.2d 1352, 1358 (Fla. 1994) ("[S]ubtantive law prescribes duties and rights and procedural law concerns the means and methods to apply and enforce those duties and rights.").
First, application of the 1992 statute imposes a new obligation on State Farm, not found in the 1989 version or in its contract, requiring it to pay the amount of UniSun's settlement offer to the Hassens before it is entitled to preserve its long-recognized legal right to subrogation. Second, the application of the statute's mandate of such an advance payment to preserve this established right abrogates State Farm's vested right under the 1989 statute and its contract to have its liability for damages conclusively resolved in a lawsuit prior to having to pay any award to the Hassens. Third, the imposition of this new obligation compels State Farm to make an immediate award to the Hassens prior to the exhaustion of UniSun's insurance coverage, which was also not required under the 1989 version of the statute or its contract. Moreover, the effect of requiring such an immediate payment is to substantially alter the purpose of uninsured motorist coverage under the 1989 statute and the contract, which was to compensate the Hassens for a shortfall in damages occurring after the exhaustion of UniSun's liability insurance coverage.
Additionally, the statute's requirement of an immediate payment effectively deprives State Farm of the right to question its legal liability for noneconomic damages under its contract in the event the tortfeasors had personal injury protection insurance coverage under section 627.737(2), Florida Statutes (1989), at the time of Mrs. Hassen's accident. In that regard, section 627.727(7), Florida Statutes (1989), provided that:
The legal liability of an uninsured motorist coverage insurer does not include damages in tort for pain, suffering, mental anguish, and inconvenience unless the injury or disease is described in one or more of paragraphs (a) through (d) of s. 627.737(2).[8]
Section 627.737(2), which describes the "injury" or "disease" requirements that must first be met, provided as follows:
In any action of tort brought against the owner, registrant, operator, or occupant of a motor vehicle with respect to which security has been provided as required by ss. 627.730-627.7405, or against any person or organization legally responsible for his acts or omissions, a plaintiff may recover damages in tort for pain, suffering, mental anguish, and inconvenience because of bodily injury, sickness, or disease arising out of the ownership, maintenance, operation, or use of such motor vehicle only in the event that the injury or disease consists in whole or in part of:
(a) Significant and permanent loss of an important bodily function.
(b) Permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement.
(c) Significant and permanent scarring or disfigurement.
(d) Death.[9]
Thus, "[i]n view of section 627.727(7), it is clear that the statute does not require an insurance carrier to provide uninsured motorist coverage for pain, suffering, mental anguish, and inconvenience unless the threshold requirements of section 627.737(2) have been met." Dauksis v. State Farm Mut. Auto. Ins. Co. 623 So.2d 455, 456 (Fla. 1993).
In Dauksis, the supreme court interpreted the interplay of these statutes in the context of construing a provision of an uninsured motorist policy, identical to the one in this case, in which the uninsured motorist carrier agreed to "pay damages for bodily injury [its] insured [was] legally entitled to recover from the owner or driver of an uninsured motor vehicle." 623 So.2d at 457. The specific issue facing the court was whether the insured, based on this policy language, could recover noneconomic damages against the *136 uninsured motorist carrier without first satisfying the threshold requirements of section 627.737(2) in a factual setting involving an uninsured motorist who did not have personal injury protection coverage.
The court began its analysis by noting that the underlying legislative theory of section 627.737 "is that if every automobile has PIP coverage, injured motorists will be reimbursed by their own carriers for most of their economic damages regardless of fault, and negligence actions against third parties will be limited to the more serious cases." 623 So.2d at 456. The court also observed that section 627.737 furthers this objective by rewarding individuals who have secured personal injury protection coverage as required by Florida's no-fault law "by exempting them from liability for noneconomic damages except in cases involving permanency or death." Id. The court finally noted that under the specific policy language construed, the insured was entitled to recover the same damages from the uninsured insurer that could legally be recovered in a direct action against the uninsured motorist.
Against this statutory and contractual backdrop, the court held that the question of whether the insured could recover noneconomic damages against the uninsured motorist carrier depended on whether the uninsured tortfeasor had complied with the security provisions of Florida's no-fault law. If the tortfeasor had personal injury protection coverage then the uninsured motorist carrier, standing in the shoes of the tortfeasor, was entitled to raise as a defense to such damages its insured's failure to meet the threshold conditions of section 627.737(2). If the tortfeasor had no such security then the insured was relieved of this obligation in recovering noneconomic damages. The court then determined in Dauksis that because the insured could legally recover noneconomic damages directly from the tortfeasor based on the tortfeasor's failure to carry PIP coverage, the uninsured motorist carrier, under its policy language, was required to pay the same damages. Accord Pollard v. Williams, 623 So.2d 588 (Fla. 2d DCA 1993); State Farm Mut. Auto. Ins. Co. v. Gomez, 605 So.2d 968 (Fla. 3d DCA 1992), approved, 623 So.2d 455 (Fla. 1993).
In this case, however, if the statute's mandatory advance payment condition is enforced against State Farm, and the tortfeasors had personal injury protection coverage at the time of the accident, then State Farm is effectively deprived of its contractual and statutory right to "stand in the shoes of the tortfeasors" and question its legal liability for any noneconomic damages which Mrs. Hassen may be claiming as a result of an alleged permanent injury. Hence, by an anomalous twist of legislative fiat, the mandatory payment requirement imposed on State Farm by the 1992 statute effectively relieves Mrs. Hassen of having to satisfy the mandatory threshold requirements of section 627.737(2) before she is entitled to collect noneconomic damages from State Farm.
Finally, as the following analysis will show, the 1992 statute substantively alters the concept of uninsured motorist coverage when a carrier providing such coverage seeks to preserve subrogation rights. The effect of this substantive change, if applied to claims brought under insurance contracts predating the statute, such as State Farm's, would be to diminish the value of those contracts.
Under the 1989 version of the statute, uninsured motorist coverage was required "for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury." § 627.727(1).[10] Based on this legislative policy statement, such coverage was viewed by the supreme court as "a limited form of third party coverage inuring to the limited benefit of the tortfeasor to provide a source of financial security if the policyholder is entitled under the law to recover from the tortfeasor." Allstate Ins. Co. v. Boynton, 486 So.2d 552, 557 (Fla. 1986). The court did not construe this coverage as "first party coverage even though the policyholder pays for it." Id. Thus, unlike first party coverage, *137 where fault is not an element of recovery and an insurance company must pay a claim even if its insured is totally at fault, the court interpreted uninsured motorist coverage as requiring payment by the carrier "only if the tortfeasor would have to pay, if the claim were made directly against the tortfeasor." Id. Consistent with this interpretation, the court construed the phrase "legally entitled to recover" found in the uninsured motorist statute, as well as the policy at issue in the case, to mean "that the insured must have a claim against the tortfeasor which could be reduced to judgment in a court of law." 486 So.2d at 555. Accord Jones v. Integral Ins. Co., 631 So.2d 1132 (Fla. 3d DCA 1994).[11]
In recognition of this concept, the Boynton court observed that the uninsured motorist carrier "effectively stands in the uninsured motorist's shoes and can raise and assert any defense that the uninsured motorist could urge." 486 So.2d at 557. Furthermore, after payment of an uninsured motorist claim, "[t]he insurer is subrogated to any sum that it pays the policyholder under the UM coverage and may bring suit against the uninsured motorist to recover all sums it has paid its insured under the UM policy." 486 So.2d at 558. As noted by the court, however, this right of recovery "would be frustrated if the insurer were forced to pay claims when it would be barred by a substantive defense from winning a judgment against a tortfeasor." Id.
Under the 1992 version of the statute, however, uninsured motorist coverage effectively becomes first party coverage if the carrier opts to preserve its right of subrogation by refusing permission to its insured to settle the third party claim. That is, the statute eliminates the need for any legal determination of liability on the part of the tortfeasor by mandating an immediate advance payment to the insured in the amount of the tortfeasor's offer if the carrier chooses to preserve its right of recovery. Thus, the statute abrogates the element of fault as a condition of payment from an uninsured motorist carrier to its insured in a situation involving retention of subrogation rights by no longer requiring the insured to first establish an entitlement to uninsured motorist benefits based on a claim against a tortfeasor "which could be reduced to judgment in a court of law."
Furthermore, even though the statute later entitles the uninsured motorist carrier to recover its payment through subrogation, how does the carrier fully recover its money if, after a determination of fault, the tortfeasor is either absolved of all liability or the amount of damages ultimately awarded to the insured is less than the amount initially paid by the carrier? Two examples, based on the record in this case, poignantly manifest our concern in that regard.
Assume that "upon final resolution of the [Hassens'] underinsured motorist claim," the tortfeasors are absolved of all liability. In that event, State Farm's subrogation rights would be totally worthless in terms of being able to recover the $100,000 advance payment to the Hassens it was statutorily mandated to make in the first place in order to preserve those rights. See Jones v. Bradley, 366 So.2d 1266 (Fla. 4th DCA 1979) (where subrogor's action was barred by res judicata, subrogee's action was similarly barred).
Or, assume that "upon final resolution" of the claim the Hassens damages are fixed at $150,000, but, after a finding of 50% comparative negligence, the damages ultimately awarded are $75,000. In that event, State Farm's right of recovery would be limited to $75,000, thus impeding its ability to recover the $25,000 difference between the amount it was required to pay under the statute ($100,000) and the damages "legally" awarded the Hassens ($75,000). See Atlantic Coast Line R.R. Co. v. Campbell, 104 Fla. 274, 278, 139 So. 886, 888 (1932) ("[I]n any form of remedy the insurer can take nothing by subrogation in any case but the rights of the insured."). See also Holyoke v. Mut. Ins. Co. v. Concrete Equip., Inc., 394 So.2d 193 (Fla. 3d DCA), review denied, 402 So.2d 609 (Fla. 1981) (a *138 party's right of subrogation is limited by any impediment in the injured party's claim).
Thus, ironically, under any scenario in which the legal award to the Hassens is less than the $100,000 State Farm was required to pay to preserve its subrogation rights, such a right of recovery would always be inadequate to fully compensate State Farm. Hence, State Farm's subrogation right would be totally or partially frustrated by the bar of a substantive defense in a later action for subrogation. Such a scenario is further exacerbated when, as appears from the record in this case, one of the tortfeasors, Mr. Buttmi, may have sufficient assets to reimburse State Farm for the full amount of its payment under a subrogation claim.[12]
State Farm's only other alternative would be to sue the Hassens. But under what theory of recovery could it proceed? The only theory that comes to mind is an action for unjust enrichment. Such a cause of action, however, would appear to be unfounded because the money was not paid inadvertently or by mistake but pursuant to a lawfully enacted statute which is presumptively constitutional. See, e.g., Sharp v. Bowling, 511 So.2d 363 (Fla. 5th DCA 1987). Moreover, even if State Farm could secure a judgment, such a judgment could prove to be a hollow remedy if the Hassens have expended the money because of their immediate financial needs and were otherwise insolvent.
We think it reasonable to conclude that when State Farm executed its contract with the Hassens, it did not bargain for an insurance policy that could later be amended by legislative fiat requiring it to immediately afford $100,000 worth of fault-free coverage to the Hassens under the uninsured motorist provisions of the policy if it elected to retain its already established legal entitlement to subrogation. We think it is also a reasonable conclusion that State Farm did not enter into this contract with the expectation that if it decided to preserve this right, a later statutory consequence would be the deprivation of the time-value of this money pending the outcome of litigation to resolve the issue of fault. See Pomponio v. Claridge of Pompano Condominium, Inc., 378 So.2d 774, 782-783 (Fla. 1979) (Overton, J., specially concurring opinion).
Instead, it is a reasonable assumption that State Farm set its premium schedule with every expectation that the uninsured motorist statute in effect at the time of the contract, which was clearly incorporated in the contract and expressly required a determination of liability prior to any obligation to pay, would govern the rights and obligations of the parties in the event the Hassens made an uninsured motorist claim. In that regard, our supreme court has made it clear that "[t]he citizens of this State cannot be charged reasonably with notice of the consequences of impending legislation before the effective date of that legislation, for it is generally accepted that a statute speaks from the time it goes into effect." Dewberry v. Auto-owners Ins. Co., 363 So.2d 1077, 1080 (Fla. 1978) (footnote omitted). Or, as our United States Supreme Court so pointedly stated:
The severity of an impairment of contractual obligation can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.
Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978).
State Farm was thus entitled to rely on the substantive rights of the 1989 statute, which rights vested prior to the passage of the 1992 statute, in determining its loss exposure under its contract with the Hassens. Hence, to apply the new statute to State Farm's contract with the Hassens would unconstitutionally diminish the value of that contract. See State Farm Mut. Auto. Ins. Co. v. Gant, 478 So.2d 25 (Fla. 1985). Moreover, we emphasize again, the fact that the *139 underlying purpose of the new statute may have been just and equitable does not authorize its application to a pre-existing contract when to do so would contravene the contract impairment clause of the Florida Constitution. See Department of Trans. v. Edward M. Chadbourne, Inc., 382 So.2d 293 (Fla. 1980).
Thus, the changes wrought by the 1992 statute substantially impair State Farm's rights and obligations under its insurance contract with the Hassens by imposing a new obligation in order to preserve an already established legal and contractual right and by depriving it of other vested statutory rights specifically incorporated in the contract. It is well-established, however, that when parties have contractually agreed to recognize statutory rights, "[a] subsequent enactment should not disturb the substantive rights and duties created by this contractual relationship." Walker & LaBerge, Inc. v. Halligan, 344 So.2d 239, 243 (Fla. 1977). Accord State Farm Mut. Auto. Ins. Co. v. Gant, 478 So.2d 25 (Fla. 1985); Allstate Ins. Co. v. Garrett, 550 So.2d 22 (Fla. 2d DCA 1989), review denied, 563 So.2d 631 (Fla. 1990).
Accordingly, because the 1992 statute substantially alters the landscape of uninsured motorist law, we conclude that it is a substantive law that cannot be applied to a pending uninsured motorist claim based on an insurance contract predating the statute without diminishing the value of that contract. We, therefore, reject the Hassens' argument that it is remedial in nature.

V. CONSTITUTIONAL ANALYSIS: DUE PROCESS/ACCESS TO THE COURTS
Even if we were to construe the 1992 statute as only changing the procedure by which an uninsured motorist carrier enforces its remedy of subrogation and thus can be applied to a pending claim which is based on an event predating the statute, see Village of EL Portal v. City of Miami Shores, 362 So.2d 275 (Fla. 1978), we would still conclude that such an application fails to pass constitutional scrutiny in two significant respects. First, the statute violates an uninsured motorist carrier's right to due process of law in terms of property deprivation as guaranteed by the Fourteenth Amendment to the United States Constitution and by article I, section 9, of the Florida Constitution. Second, the statute violates an uninsured motorist carrier's right of access to the courts as protected by article I, section 21, of the Florida Constitution, which provides that "[t]he courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay."[13]

A. DUE PROCESS ANALYSIS
Our primary focus involving a due process violation centers on the statute's requirement that an uninsured motorist carrier must first make an award to its insured in the amount of the liability carrier's offer if it chooses to preserve what has always been regarded by law as a clearly established right of subrogation. As written, the statute deprives an uninsured motorist carrier of the due process right which guarantees it a prior determination on the merits in an appropriate forum before its liability for such an award is fixed by law. In that regard, the United States Supreme Court has clearly described the "root requirement" of the due process clause as being "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) *140 (emphasis in original) (footnote omitted). See also Peoples Bank of Indian River County v. State Dep't of Banking & Fin., 395 So.2d 521 (Fla. 1981) (at a minimum, due process involves reasonable notice and a fair opportunity to be heard before rights are decided); Scholastic Sys., Inc. v. LeLoup, 307 So.2d 166, 169 (Fla. 1974) ("Due process requires that no one shall be personally bound until he has had his `day in court.'").
The 1992 statute, as applied in this case, provided State Farm no "fair opportunity" to be heard before it was called upon to divest itself of a significant property interest if it chose to preserve its long-recognized right of subrogation. Instead, the statute placed State Farm in the untenable position of being bound by law to the outcome of private settlement negotiations between the Hassens and UniSun that essentially determined its immediate liability for an award of damages, including noneconomic damages, even though it was not a party to the negotiations and had no available means to assert any legal defenses to the Hassens' claim. Cf. Freidus v. Freidus, 89 So.2d 604 (Fla. 1956) (holding that a corporation is entitled to due process of law insofar as property rights are concerned so that a money judgment may not be entered against it where it was not a party to a cause and was not served with process, even though the principal stockholder was a party to the cause).
The fact that the statute entitled State Farm to recover its payment through a subrogation action at some unspecified time after final resolution of the Hassens' uninsured motorist claim, does not, in our view, lessen this due process violation, for "it is now well settled that a temporary, nonfinal deprivation is nonetheless a `deprivation' in terms of the Fourteenth Amendment." Fuentes v. Shevin, 407 U.S. 67, 84-85, 92 S.Ct. 1983, 1996, 32 L.Ed.2d 556 (1972). Moreover, as we have previously noted in our analysis, depending on the outcome of the claim's final resolution, State Farm's right of recovery may either be legally worthless or inadequate to fully compensate it for the money the statute mandated it pay to the Hassens. Additionally, as also noted, even if State Farm did recover the full amount of its payment, it would still be deprived of the time-value of its money pending resolution of the claim. Thus, even though the statute later provides a remedy for a "post-deprivation" vindication of State Farm's subrogation rights, such a remedy, for due process purposes, is "too little, too late."
Accordingly, we conclude that section 627.727(6), Florida Statutes (Supp. 1992), as applied in this case, unconstitutionally impaired State Farm's due process rights in two significant respects. First, it placed State Farm at the whim and caprice of the final outcome of private settlement negotiations without providing an independent forum to assert its right to be heard before it was required to divest itself of a significant property interest if it chose to preserve its subrogation rights. See Fuentes v. Shevin, 407 U.S. 67, 93-95, 92 S.Ct. 1983, 2001, 32 L.Ed.2d 556 (1972) (state power, without some form of supervision, cannot confer on private parties the right to unilaterally invoke that power to serve their own private interests). Second, and just as egregious, the statute did not provide State Farm with an immediate, meaningful post-deprivation proceeding in which to vindicate its right of recovery. See Unique Caterers, Inc. v. Rudy's Farm Co., 338 So.2d 1067, 1071 (Fla. 1976).

B. ACCESS TO THE COURTS ANALYSIS
We also determine that the 1992 statute impermissibly restricts an uninsured motorist carrier's right of access to the courts to resolve any disputed issue of liability before it is required to make an award of damages. Although the legislature may restrict access to the courts, it must first provide a reasonable alternative remedy or commensurate benefit or it must make a showing of overpowering public necessity justifying the restriction with a finding that there is no alternative method of meeting such public necessity. Kluger v. White, 281 So.2d 1 (Fla. 1973). The statute fails to meet either prong of this test.
As previously noted, before State Farm could legally question its obligation to make an award of damages to the Hassens' based *141 on their uninsured motorist claim, it first had to make an advance payment of $100,000 to secure this right in the event it sought to preserve its right of subrogation. However, "[t]he constitutional right of access to the courts sharply restricts the imposition of financial barriers to asserting claims or defenses in court." Psychiatric Assoc. v. Siegel, 610 So.2d 419, 424 (Fla. 1992) (emphasis added). See also G.R.B. Inv., Inc. v. Hinterkopf, 343 So.2d 899, 901 (Fla. 3d DCA 1977) ("[R]equiring payment of a sum of money into the registry of the court unrelated to filing fees as a condition for defending a lawsuit has long been declared constitutionally impermissible."). And, again, in the event of a subsequent legal determination that the Hassens were entitled to less than what State Farm was required to pay initially, the statute provided State Farm with no reasonable alternative remedy to fully recover its initial payment. Moreover, the only "commensurate benefit" which the statute conferred on State Farm as a result of having to make the advance payment, the preservation of its right of subrogation, is illusory because State Farm already had that right by law and by contract.
Furthermore, the legislature has not demonstrated an overpowering public necessity for imposing such a financial restriction with a concomitant showing that no alternative method of addressing such public necessity exists. See Smith v. Department of Ins., 507 So.2d 1080, 1089 (Fla. 1987). Unlike other statutes in which the legislature has taken great care to delineate why an overpowering public necessity requires it to act by imposing restrictions on access to the courts,[14] the legislature has made no such findings either in the statute itself or the enabling act detailing why there exists an overwhelming public need to financially restrict an uninsured motorist carrier's right to legally question its liability for damages in a claim for uninsured motorist benefits. Such a declaration, although not binding, would have been very persuasive in determining the need for such a restriction. See State v. Cotney, 104 So.2d 346 (Fla. 1958).
Furthermore, similar to Pomponio v. Claridge of Pompano Condominium, Inc., 378 So.2d 774 (Fla. 1979), we have not been made aware of any documented evidence establishing that uninsured motorist carriers in this state are engaging in wholesale bad faith refusals to approve settlements of third party claims, thereby depriving their insureds of immediate access to needed compensation. Moreover, to the extent that some carriers may be engaging in such tactics, the legislature has provided a remedy by enacting section 627.727(10), Florida Statutes (Supp. 1992), which provides that in an action for bad faith under section 624.155 an uninsured motorist carrier's liability for damages includes "the amount in excess of the policy limits, any interest on unpaid benefits, reasonable attorney's fees and costs, and any damages caused by a violation of a law of this state."
Accordingly, we conclude that the application of section 627.727(6), Florida Statutes (Supp. 1992), to this case unconstitutionally infringed on State's Farm's right of access to the courts for a determination of its liability for damages under the Hassens' uninsured motorist claim by imposing a financial precondition for such access that constituted a substantial burden on its right to be heard. See Psychiatric Assoc., Inc. v. Siegel, 610 So.2d 419 (Fla. 1992).

VI. CERTIFIED QUESTION
Because we determine, however, that the constitutional issues posed in this case are ones of great public importance, we certify the following two-part question to the Florida Supreme Court:
IS SECTION 627.727(6), FLORIDA STATUTES (SUPP. 1992), CONSTITUTIONAL? IF SO, IS IT A SUBSTANTIVE STATUTE, AS OPPOSED TO A REMEDIAL STATUTE, SUCH THAT ITS TERMS CANNOT BE APPLIED *142 CONSTITUTIONALLY TO A PENDING CLAIM BROUGHT UNDER THE UNINSURED MOTORIST PROVISIONS OF AN AUTOMOBILE INSURANCE POLICY ISSUED PRIOR TO ITS EFFECTIVE DATE?

VII. CONCLUSION
We, therefore, reverse the trial court's partial final summary judgment finding uninsured motorist coverage in favor of the Hassens and remand for further proceedings. On remand, we specifically direct the trial court to apply the provisions of section 627.727(6), Florida Statutes (1989), to this case in determining the issue of coverage. In the event State Farm raises the issue of prejudice because of the Hassens' unauthorized release of the tortfeasors, we further direct the trial court to resolve that issue in accordance with the principles stated in Rafferty v. Progressive American Insurance Company, 558 So.2d 432 (Fla. 2d DCA 1990).
Reversed and remanded with directions; question certified.
THREADGILL, A.C.J., and PATTERSON, J., concur.
NOTES
[1] Documents in the record appear to support this statement.
[2] This section was amended by a comprehensive act which undertook a wholesale revision of various insurance statutes. Ch. 92-318, Laws of Fla.
[3] Subsection (1) provided in pertinent part that:

The [uninsured motor vehicle] coverage described under this section shall be over and above, but shall not duplicate, the benefits available to an insured .. . under any motor vehicle liability insurance coverage ... and such coverage shall cover the difference, if any, between the sum of such benefits and the damages sustained, up to the maximum amount of such coverage provided under this section. (Emphasis added.)
Thus, as we noted in Michigan Millers Mutual Insurance Company v. Bourke, 581 So.2d 1365, 1366 (Fla. 2d DCA 1991), approved, 607 So.2d 418 (Fla. 1992), the purpose of such coverage "is meant to compensate the plaintiff for a deficiency in the tortfeasor's personal liability insurance coverage."
[4] The title to chapter 92-318, at 3081, 3084, reads in part as follows: "[a]n act relating to insurance; ... amending s. 627.727, F.S.; ... revising provisions with respect to subrogation rights of underinsured motorist insurers... ." See Parker v. State, 406 So.2d 1089 (Fla. 1981) (title of enacting legislation is one indicator of legislative intent).
[5] We reject the Hassens' argument that we should consider paragraph (a) separately from paragraph (b) in deciding this case. It is obvious that they relate to the same subject matter and are inextricably intertwined. Accordingly, we are obligated to construe them together. See Major v. State, 180 So.2d 335 (Fla. 1965) (statutes relating to the same subject matter and arising out of the same act must be read in pari materia).
[6] The 1992 revision of section 627.727(6), which alters the contours of an uninsured motorist carrier's subrogation rights, is the latest example of the "fragile" relationship existing between the legislature and the uninsured motorist statute. See Quirk v. Anthony, 563 So.2d 710, 713 (Fla. 2d DCA 1990), approved, 583 So.2d 1026 (Fla. 1991). As our subsequent analysis will show, however, the legislature's well-intentioned change in the law has the effect of roiling the waters instead of calming the seas of uninsured motorist litigation. See Allstate Ins. Co. v. Boynton, 486 So.2d 552, 559 (Fla. 1986).
[7] In creating subsection (10), we perceive the legislative purpose to have been the overruling of the supreme court's holding in McLeod v. Continental Insurance Company, 591 So.2d 621, 626 (Fla. 1992), that rejected "the contention that first-party bad faith damages should be fixed at the amount of the excess judgment" in an action for bad faith brought against an uninsured motorist carrier under section 624.155, Florida Statutes (1985). We do not determine, however, the legislature's authority to effectuate such a retroactive change in the law.
[8] The legislature left this subsection intact when it amended the statute in 1992. Ch. 92-318, § 79, at 3150, Laws of Fla.
[9] This subsection continues to retain this language to the present day. § 627.737(2), Fla. Stat. (1993).
[10] The legislature also left this subsection undisturbed when it amended the statute in 1992. Ch 92-318, § 79, at 3147-3148, Laws of Fla.
[11] In the Hassens' uninsured motorist policy, State Farm similarly agreed to "pay damages for bodily injury an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle." (Emphasis added.)
[12] Because the record is not fully developed, we do not determine whether State Farm was prejudiced by the Hassens' release of the tortfeasors. We leave that determination to the trial court on remand. See Watherwax v. Allstate Ins. Co., 538 So.2d 108 (Fla. 2d DCA 1989).
[13] It could be argued that our determination that the 1992 statute cannot be retroactively applied to the Hassens' claim moots any further consideration of State Farm's additional argument that a prospective application of the statute cannot stand constitutional scrutiny. The law is clear, however, that mootness does not destroy an appellate court's jurisdiction when the question raised is of substantial public interest and is likely to recur, especially when due process rights are at stake. Times Publishing Co. v. Burke, 375 So.2d 297 (Fla. 2d DCA 1979). Thus, because the continued application of the statute is a matter of great public importance in the highly regulated field of uninsured motorist insurance and is obviously occurring on a state-wide basis, any perceived mootness would still not divest us of the jurisdictional authority to provide future guidance as to the basic constitutionality of the statute. See Holly v. Auld, 450 So.2d 217 (Fla. 1984).
[14] Section 766.301, Florida Statutes (1993), for example, sets forth extensive findings justifying the public need for the establishment of an exclusive administrative remedial process for the compensation of birth-related neurological injuries on a no-fault basis in a limited class of cases. See Turner v. Hubrich, 19 Fla. L. Weekly D2239, ___ So.2d ___ (Fla. 5th DCA Oct. 21, 1994).