378 So.2d 774 (1979)
Arthur R. POMPONIO, et al., Petitioners,
v.
The CLARIDGE OF POMPANO CONDOMINIUM, INC., Etc., et al., Respondents.
No. 52812.
Supreme Court of Florida.
November 15, 1979.
Rehearing Denied January 30, 1980.
*775 Curtin R. Coleman, of Coleman, Leonard & Morrison, and Davis W. Duke, Jr., of McCune, Hiaasen, Crum, Ferris & Gardner, Fort Lauderdale, for petitioners.
Jeffrey E. Streitfeld and Mark B. Schorr, of Becker, Poliakoff & Sachs, Fort Lauderdale, for respondents.
ENGLAND, Chief Justice.
The present cause is before us to determine the constitutionality of section 718.401(4), Florida Statutes (1977), which provides for the deposit of rents into the registry of the court during litigation involving obligations under a condominium lease.[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. The question of whether this statute impermissibly impairs the obligation of contracts in violation of article I, section 10 of the Florida and federal constitutions  an issue expressly reserved in an earlier case concerning the statute's operation[2]  is now squarely presented.
The Claridge of Pompano Condominium, Inc., ("the Association") and several individual unit owners who are members of the Association brought suit against the developer of the condominium and the lessors of a ninety-nine year recreational lease associated with the condominium.[3] The Association, as a representative of the unit owners, is the named lessee under the recreational lease. As required by section 718.401(4), the trial court granted the Association and unit owners' motion to permit payment of rents into the registry of the court, despite the developer and lessors' contention that the provision is unconstitutional. By this appeal, the developer and lessors seek to *776 have the ruling reversed. We hold that the statute is unconstitutional.
The parties argue, respectively, that the rent deposit statute either permissibly modifies a contractual remedy or impermissibly impairs substantial contract rights and obligations. Yet a proper analysis of this issue cannot hinge exclusively on any supposed distinction between "remedies" and "obligations." The United States Supreme Court has discarded this distinction as "an outdated formalism,"[4] and we choose to do likewise. To formulate a more logical approach to the question of impairment, it is necessary at the outset to examine the interpretive development of the contract clause in the decisions of the United States Supreme Court.
While the intent of the framers with respect to the contract clause has generated considerable speculation, its origins remain too obscure to be of any assistance in its construction.[5] It is nonetheless clear that in the early decisions of the United States Supreme Court the clause was interpreted literally as a strict prohibition.[6] As with other seemingly absolute constitutional provisions, however, it soon became evident that some degree of flexibility would have to be read into the clause to ameliorate the harshness of such rigid application.[7] In order to accommodate necessary legislation without deviating from the principle that all laws impairing the obligations of contract are constitutionally prohibited, the Court developed two basic analytical devices  the "obligation-remedy" distinction and the "reserved powers" doctrine[8]  both of which dominated contract clause interpretation for the next century.

The "Obligation-Remedy" Test
Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231 (1934), is the most important case in the history of contract clause interpretation.[9] In Blaisdell, the Court upheld a mortgage moratorium statute that Minnesota had enacted to provide relief for homeowners threatened with foreclosure. The statute enabled a court to extend the time for redemption beyond that provided for in the mortgage contract. Though the statute directly affected lenders' foreclosure rights, the Court ruled that it did not violate the contract *777 clause, reasoning that "the State ... continues to possess authority to safeguard the vital interests of its people."[10]
In its decision, the Blaisdell majority traced the judicial history of the obligation-remedy distinction[11] and the reserved powers doctrine[12] in contract clause analysis. It then concluded:
It is manifest from this review of our decisions that there has been a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare... .
It is no answer to say that this public need was not apprehended a century ago, or to insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time. .. . "The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago."[13]
Having jettisoned the analytical framework which governed prior contract clause cases, the Court formulated a new test against which legislation would be measured:
The question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end.[14]
Thus, beginning with Blaisdell, the Court began to permit certain "reasonable" impairments of contractual obligations.[15] This new and more flexible approach to contract clause analysis later was refined and developed by the Court in three major cases.[16]

The Evolving "Reasonableness" Test
In City of El Paso v. Simmons, 379 U.S. 497, 85 S.Ct. 577 (1965), the Court stated that it would not even "pause to consider ... again the dividing line under federal law between `remedy' and `obligation'... ."[17] Instead, the majority noted that "decisions dating from [Blaisdell] have not placed critical reliance on the distinction between obligation and remedy," and proceeded to demonstrate that its post-Depression rulings had been made "without any regard to whether the measure was substantive or remedial."[18] Recognizing that "`[t]he Constitution is "intended to preserve practical and substantial rights, not to maintain theories,"'"[19] the Court in Simmons clearly refuted the notion that statutes could be properly measured by any criteria other than reasonableness:
This Court's decisions have never given a law which imposes unforeseen advantages or burdens on a contracting party constitutional immunity against change... . Laws which restrict a party to those gains reasonably to be expected *778 from the contract are not subject to attack under the Contract Clause, notwithstanding that they technically alter an obligation of a contract.[20]
In resolving the controversy before it, the Simmons majority applied what Justice Black decried in dissent as a "balancing" test,[21] giving due consideration for the "buyer's undertaking," whether "the buyer was substantially induced to enter into these contracts" because of the promise, and the significance of the "State's vital interest,"[22] and concluded that the Texas statute at issue was constitutionally permissible because "[t]he measure taken ... was a mild one indeed, hardly burdensome to the purchaser ..., but nonetheless an important one to the State's interest."[23]
The next major decision in the interpretive development of the contract clause was United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505 (1977).[24] The Court's analysis in United States Trust both expanded upon the "balancing" test of Simmons and refined the "reasonableness" standard of Blaisdell:
[a] finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution.
... [T]he Contract Clause limits otherwise legitimate exercises of state legislative authority, and the existence of an important public interest is not always sufficient to overcome that limitation. .. . Moreover, the scope of the State's reserved power depends on the nature of the contractual relationship with which the challenged law conflicts.
....
... The Court in Blaisdell recognized that laws intended to regulate existing contractual relationships must serve a legitimate public purpose.... Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.[25]
The Court concluded that the correct standard to be employed in assessing the validity of legislation affecting a state's own contracts is that:
[a]s with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and *779 necessary to serve an important public purpose.[26]
In finding that the challenged statute did not satisfy this test, the Court emphasized that while "[t]he extent of impairment is certainly a relevant factor in determining its reasonableness," an enactment cannot be considered "necessary" if the legislature "without modifying the covenant at all, ... could have adopted alternative means of achieving their ... goals," because "a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well."[27]
In its most recent pronouncement on the subject, Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716 (1978), the Court invalidated a Minnesota law which retroactively imposed upon certain private companies with voluntary pension plans additional obligations as to employees who would not have been entitled to such benefits under the original terms of the plan. Without any mention of the obligation-remedy distinction, the majority reviewed the underpinnings of the Court's post Blaisdell decisions and formulated its statement of the proper approach to contract clause challenges thusly:
In applying these principles to the present case, the first inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.[28]
Several factors to be considered in this balancing test were identified in Spannaus:
(a) Was the law enacted to deal with a broad, generalized economic or social problem?[29]
(b) Does the law operate in an area which was already subject to state regulation at the time the parties' contractual obligations were originally undertaken, or does it invade an area never before subject to regulation by the state?[30]
(c) Does the law effect a temporary alteration of the contractual relationships of those within its coverage, or does it work a severe, permanent, and immediate change in those relationships  irrevocably and retroactively?[31]

Analysis and Conclusion
We recognize that this Court, when construing a provision of the Florida Constitution, is not bound to accept as controlling the United States Supreme Court's interpretation of a parallel provision of the federal Constitution. Yet such rulings have long been considered helpful and persuasive, and are obviously entitled to great weight.[32] With this in mind, we now choose *780 to adopt an approach to contract clause analysis similar to that of the United States Supreme Court. That Court's decisions[33] in this area of law convince us that such an approach is the one most likely to yield results consonant with the basic purpose of the constitutional prohibition.
In our view, any realistic analysis of the impairment issue in Florida must logically begin both with Yamaha Parts Distributors Inc. v. Ehrman,[34] which applied the well-accepted principle that virtually no degree of contract impairment is tolerable in this state, and with the notion enunciated in Louisiana ex rel. Ranger v. New Orleans,[35] that "he who pays too late, pays less."[36] These concepts direct our inquiry to the actual effect of the rent deposit statute on the lessor's contractual right to receive its bargained-for rent. That effect, when fully analyzed, persuades us that in the absence of contractual consent[37] significant contract rights are unreasonably impaired by the statute's operation.[38]
Preliminarily, it should be noted that the deposit into court of moneys which one or another contract litigant may withdraw only after incurring some legal cost or a modest delay is constitutionally permissible.[39] Our conclusion in Yamaha that "virtually" no impairment is tolerable necessarily implies that some impairment is tolerable, although perhaps not so much as would be acceptable under traditional federal contract clause analysis.
To determine how much impairment is tolerable, we must weigh the degree to which a party's contract rights are statutorily impaired against both the source of authority under which the state purports to alter the contractual relationship and the evil which it seeks to remedy. Obviously, this becomes a balancing process to determine whether the nature and extent of the impairment is constitutionally tolerable in light of the importance of the state's objective, or whether it unreasonably intrudes into the parties' bargain to a degree greater than is necessary to achieve that objective.
Section 718.401(4), of course, does more than provide a procedure for the deposit of rents subject to disbursement upon compliance with some procedural showing or its equivalent.[40] This statute potentially allows the retention in court of at least some portion of the deposited rent during the entire term of litigation. Barring the current use of court-retained rent moneys is an *781 economic deprivation for which a landlord obviously has not bargained, producing potential erosion of value (at least in our persistently inflationary economy) which goes beyond mere inconvenience. To this extent at least, the statute "impairs" the landlord's contract.[41]
The degree of impairment created by section 718.401(4) is confined to amounts deemed by the legislature not to be essential to the maintenance of the property in dispute. Withdrawals are authorized for amounts "necessary for payment of taxes, mortgage payments, maintenance and operating expenses, and other necessary expenses incident to maintaining and equipping the leased facilities."[42] This formulation precludes a uniform level of impairment in each case, inasmuch as the impairment in any particular situation will depend directly on the disparity between the contract amount of rent and the landlord's property maintenance obligations  that is, the lessor's built-in profit.[43] In this formulation, of course, all other needs or desires of the lessor for its promised rents are wholly ignored.[44]
On the other side of the ledger is the state's interest in requiring a unit owner's deposit of leasehold rents into court during the course of litigation. This provision rests on the state's exercise of its police power to promote the health, safety, and welfare of its citizens. While the specific objectives for section 718.401(4) are neither expressly articulated nor plainly evident from a reading of the statute,[45] the litigants have suggested that the legislature's concern was the protection of unit owners from the lessor's foreclosure for non-payment of rent during the pendency of the litigation. To this assertion we have two answers. There is to our knowledge neither a documented threat of massive condominium foreclosures in Florida nor any documentation of the underlying premise that unit owners would withhold rents from landlords pending litigation with them.
We believe that the balance between the state's probable objectives and its method of implementation, on the one hand, and the degree of contract impairment inflicted in furtherance of its policy, on the other, favors preservation of the contract over this exercise of the police power. Bearing on *782 our view is the fact that the manner in which the police power has been wielded here is not the least restrictive means possible. See City of El Paso v. Simmons, 379 U.S. 497, 516-17, 85 S.Ct. 577 (1965). Contrast, for example, Florida's Residential Landlord and Tenant Act, which similarly requires the payment of rent into the court's registry during the pendency of a lawsuit between parties to the lease,[46] but which authorizes the court to disburse to a landlord all or any portion of the funds on deposit upon a showing of "actual danger of loss of the premises or other personal hardship resulting from the loss of rental income from the premises."[47] In that statute the legislature has acknowledged that the consequences of rent detention may extend to a deprivation of sums needed for purposes other than the preservation of the controverted property. The severity of impairment wreaked by section 718.401(4) would have been mitigated by a "personal hardship" provision like that in the landlord-tenant act, but none is present.[48]
Therefore, in the face of an express constitutional prohibition against any law "impairing the obligation of contracts,"[49] the state's justification for an exercise of the police power to impair the lessor's contractual bargain does not, in our opinion, provide sufficient countervailing considerations. As applied retroactively, absent a lessor's express consent to its incorporation into the terms of the contract, the statute is invalid. Accordingly, the trial court's order authorizing payment of rents into the registry of the court is hereby vacated.
It is so ordered.
BOYD, OVERTON and SUNDBERG, JJ., concur.
OVERTON, J., concurs specially with an opinion.
ADKINS, J., concurs in result only.
ALDERMAN, J., dissents.
OVERTON, Justice, concurring specially.
I concur. This Court's recent construction of section 28.33, Florida Statutes (1977), in Beckwith v. Webb's Fabulous Pharmacies, Inc., 374 So.2d 951 (Fla. 1979), expressly held that moneys deposited in the registry of the court are "held by a public officer in a public account [and] accrue to the benefit of all of the people." We further stated that "interest earned on the clerk of the circuit court's registry account is not private property." This holding precludes any disposition of these earned interest funds to the proper prevailing party. Because of our construction of section 28.33, I must agree that section 718.401(4), which mandates the deposit of rents into the registry of the courts during litigation concerning a condominium lease, does in fact constitute an impairment of rights guaranteed under the contract clause and due process provisions of the Florida and United States Constitutions. With the prime rate of interest at an all-time high, a party's loss of earned interest is a significant financial deprivation.
The fact that section 718.401(4) has the effect of mandating the forfeiture of interest earned on rents due under the lease when there is litigation concerning the lease makes this depository provision of the statute invalid. It should be noted that the clerk of the circuit court receives a fee for his services apart from the interest earned on deposited funds. § 28.33, Fla. Stat. (1977).
*783 In my view, if the trial court had the authority to direct the disposition of interest earned and the lessors or lessees could be made whole if their position was upheld at the conclusion of the proceedings, then such a depository arrangement would be constitutional.
NOTES
[1] Section 718.401(4) provides:

In any action by the lessor to enforce a lien for rent payable or in any action by the association or a unit owner with respect to the obligations of the lessee or the lessor under the lease, the unit owner may raise any issue or interpose any defenses, legal or equitable, that he may have with respect to the lessor's obligations under the lease. If the unit owner initiates any action or interposes any defense other than payment of rent under the lease, the unit owner or the association shall pay into the registry of the court any allegedly accrued rent and the rent which accrues during the pendency of the proceeding, when due. If the unit owner fails to pay the rent into the registry of the court, it shall constitute an absolute waiver of the unit owner's defenses other than payment, and the lessor shall be entitled to default. When the unit owner has deposited the required funds into the registry of the court, the lessor may apply to the court for disbursement for all or part of the funds shown to be necessary for the payment of taxes, mortgage payments, maintenance and operating expenses, and other necessary expenses incident to maintaining and equipping the leased facilities. The Court, after preliminary hearing, may award all or part of the funds on deposit to the lessor for such purpose.
[2] Century Village, Inc. v. Wellington, E, F, K, L, H, J, M, & G, Condominium Ass'n, 361 So.2d 128, 132 (Fla. 1978).
[3] Although the Pompano lease was executed prior to the enactment of section 718.401(4) or its predecessor, section 711.63(4), Florida Statutes (1975), the Court specifically held in Century Village that this provision was intended by the legislature to be applied retroactively. Unlike the lease considered in Century Village, the present condominium lease does not incorporate statutory amendments enacted subsequent to the contract's execution.
[4] United States Trust Co. v. New Jersey, 431 U.S. 1, 19 n. 17, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).
[5] "In the construction of the contract clause, the debates in the Constitutional Convention are of little aid." Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 427, 54 S.Ct. 231, 235-36, 78 L.Ed. 413 (1934). See also Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 257, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) (Brennan, J., dissenting). The most unkind of observers has concluded that the provision was "apparently motivated by the economic self-interest of the framers," Comment, Revival of the Contract Clause, 39 Ohio St.L.J. 195, 196 (1978), but a variety of other, more noble, purposes have also been suggested. See Comment, The Contract Clause and the Constitutionality of Retroactive Application of Exemption Statutes: A Reconsideration, 9 Pac.L.J. 889, 892-93 (1978), and sources cited therein.
[6] See, e.g., Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819). Until the late nineteenth century, the contract clause was the subject of the Court's attention more frequently than any other provision except the commerce clause, B. Wright, The Contract Clause of the Constitution 91-92 (1938), and as the Court itself recently observed, "it was perhaps the strongest single constitutional check on state legislation during our early years as a Nation ... ." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978).
[7] See generally Comment, The Contract Clause Reemerges: A New Attitude Toward Judicial Scrutiny of Economic Legislation, 1978 S.Ill.U.L.J. 258, 260.
[8] For a brief discussion and comparison of these two approaches, see, e.g., Comment, Revival of the Contract Clause, 39 Ohio St.L.J. 195, 196-98 (1978); Comment, supra note 4, at 260-62.
[9] The United States Supreme Court has itself stated that "[t]he Blaisdell opinion ... amounted to a comprehensive restatement of the principles underlying the application of the Contract Clause," City of El Paso v. Simmons, 379 U.S. 497, 508, 85 S.Ct. 577, 583-84, 13 L.Ed.2d 446 (1965), and "is regarded as the leading case in the modern era of Contract Clause interpretation." United States Trust Co. v. New Jersey, 431 U.S. 1, 15, 97 S.Ct. 1505, 1514, 52 L.Ed.2d 92 (1977).
[10] 290 U.S. at 434, 54 S.Ct. at 238-39.
[11] Id. at 429-34, 54 S.Ct. 231.
[12] Id. at 434-38, 54 S.Ct. 231.
[13] Id. at 442-43, 54 S.Ct. at 241-42 (quoting from Missouri v. Holland, 252 U.S. 416, 433, 40 S.Ct. 382, 64 L.Ed. 641 (1920)).
[14] 290 U.S. at 438, 54 S.Ct. at 240. In our opinion, however, there is considerable merit to the argument that, without regard to the particular approach which it claimed to be applying, the Court both before and after Blaisdell actually proceeded to work practical solutions based on the facts and circumstances of each case. See Comment, The Role of the Contract Clause in Municipalities' Relations with Creditors, 1976 Duke L.J. 1321, 1327. If this theory is correct, then the "new test" unveiled in Blaisdell was really no more than an attempt to restate what the Court had actually been doing all along, with an implicit admission that the traditional obligation-remedy distinction had been used merely for the purpose of post-analytical labelling and categorization.
[15] Comment, supra note 5, at 198.
[16] See notes 17-31 and accompanying text infra.
[17] 379 U.S. at 506, 85 S.Ct. at 582.
[18] Id. at 506-07 n. 9, 85 S.Ct. at 582-83 n. 9.
[19] Id. at 515, 85 S.Ct. at 587 (quoting from Faitnote Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502, 514 (1942)).
[20] 379 U.S. at 515, 85 S.Ct. at 587.
[21] Id. at 517, 528-33, 85 S.Ct. 577 (Black, J., dissenting).
[22] Id. at 514-15, 85 S.Ct. at 587.
[23] Id. at 516-17, 85 S.Ct. at 588.
[24] In United States Trust, the Court had this to say about the obligation-remedy distinction:

[I]t was ... recognized very clearly that the distinction between remedies and obligations was not absolute... . More recent decisions have not relied on the remedy/obligation distinction, primarily because it is now recognized that obligations as well as remedies may be modified without necessarily violating the Contract Clause.
Although now largely an outdated formalism, the remedy/obligation distinction may be viewed as approximating the result of a more particularized inquiry into the legitimate expectations of the contracting parties.
431 U.S. at 19 n. 17, 97 S.Ct. at 1517 n. 17 (citations omitted and emphasis added).
[25] Id. at 21-22, 97 S.Ct. at 1517-18. The majority put to rest any notion that a "reasonableness" standard was utilized in Blaisdell solely because of the emergency conditions which prompted the Minnesota legislation at issue in that case:

Blaisdell suggested further limitations that have since been subsumed in the overall determination of reasonableness... . Undoubtedly the existence of an emergency and the limited duration of a relief measure are factors to be assessed in determining the reasonableness of an impairment, but they cannot be regarded as essential in every case.
Id. at 22-23 n. 19, 97 S.Ct. at 1518 n. 19. Although the Court in a more recent decision appeared to make much of the "broad and desperate emergency economic conditions" of which judicial notice was taken in Blaisdell, it was careful to point out that the reference "is not to suggest that only an emergency of great magnitude can constitutionally justify a state law impairing the obligations of contracts." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 249 & n. 24, 98 S.Ct. 2716, 2725, & n. 24 (1978).
[26] 431 U.S. at 25, 97 S.Ct. at 1519 (emphasis added).
[27] Id. at 27-31, 97 S.Ct. at 1520-22.
[28] 438 U.S. at 244-45, 98 S.Ct. at 2723 (footnotes omitted and emphasis added). Reasoning that the effect of the statute on the employer's contractual obligation was severe and that the law "simply does not possess the attributes of those state laws that in the past have survived challenge under the Contract Clause of the Constitution," see notes 29-31 and accompanying text infra, the Court concluded that "if the Contract Clause means anything at all, it means that Minnesota could not constitutionally do what it tried to do to the company in this case." Id. at 250-51, 98 S.Ct. at 2726.
[29] Id. at 250 (citing Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 445, 54 S.Ct. 231 (1934)).
[30] Id. (citing Veix v. Sixth Ward Bldg. & Loan Ass'n, 310 U.S. 32, 38, 60 S.Ct. 792, 84 L.Ed. 1061 (1940)).
[31] Id. (citing United States Trust Co. v. New Jersey, 431 U.S. 1, 22, 97 S.Ct. 1505 (1977)).
[32] See, e.g., Dudley v. Harrison, McCready & Co., 127 Fla. 687, 699, 173 So. 820, 825 (1937); State v. Hetland, 366 So.2d 831, 836 (Fla. 2d DCA 1979); Leveson v. State, 138 So.2d 361, 364 (Fla. 3d DCA 1962); Houston v. State, 113 So.2d 582, 584-85 (Fla. 1st DCA 1959).
[33] See notes 9-31 and accompanying text supra.
[34] 316 So.2d 557 (Fla. 1975).
[35] 102 U.S. 203, 26 L.Ed. 132 (1880).
[36] Id. at 207. As applied to this rent deposit statute, the rubric should be rephrased to read that "he who receives payment too late, receives less."
[37] See note 3 supra.
[38] We recognize the difficulty of narrowing the focus of attention on the issue of impairment so as to synthesize in subjective consideration the wisdom or necessity of this legislation. The judicial mind is required to do so, however, despite the difficulty. We must remind ourselves that the very real economic problems of condominium unit owners, as magnified by the alleged imbalance in bargaining power between unit owners and landlords, and the pervasive influence of the condominium industry on Florida's economy and citizens, are not alone determinative of the impairment question. These considerations are relevant, of course, in this context as well as others. See Avila South Condominium Ass'n v. Kappa Corp., 347 So.2d 599 (Fla. 1977).
[39] The deposit procedure of Florida Rule of Civil Procedure 1.600, for example, does not "impair" contract rights in the constitutional sense. Unlike the statutory rent deposit provision at issue in this case, our rule does not direct that disputed moneys are required to be deposited in court, but permits such a procedure to be invoked "by leave of the court." Thus, the decision as to whether or not a temporary deprivation is justified and whether withdrawal should be allowed in whole or in part, will be vested in the sound discretion of the trial judge, who can assess from the circumstances in each case the relative merit or frivolity of the claim asserted and the legitimate needs of the parties.
[40] Contrast, for example, sections 76.18 and 76.19, Florida Statutes (1977), which authorize a bond to free property from an attachment.
[41] In State ex rel. Women's Benefit Ass'n v. Port of Palm Beach Dist., 121 Fla. 746, 759, 164 So. 851, 856 (1935), we said:

To "impair" has been defined as meaning to make worse; to diminish in quantity, value, excellency or strength; to lessen in power; to weaken. Whatever legislation lessens the efficacy of the means of enforcement of the obligation is an impairment. Also if it tends to postpone or retard the enforcement of the contract, it is an impairment. (Emphasis in the original).
[42] It is unclear whether funds may be withdrawn from the deposited rents in order to improve the leased premises. One incidental effect of the uncertainty could well be that lessees' prospects for promised additional (or improved) facilities, such as tennis courts, swimming pools, or meeting halls, may be thwarted by a suit instituted by some unit owners which requires significant rent deposits.
[43] As a practical matter, the amount of "spread" will also vary from month to month depending upon such factors as seasonal maintenance needs and due dates for tax or mortgage payments. Thus, in some months the landlord may be able to withdraw virtually all, and in others none, of the rent deposits.
[44] See note 48 infra. The present lessors, in fact, would seem to be effectively barred from any disbursement under the statute in its present form. Section 718.401(4) provides that the "unit owner or association shall pay [rents] into the registry of the court." The provision permits disbursement of these rents, however, only "[w]hen the unit owner has deposited the required funds." As the Court stated in Century Village, the terms "unit owner" and "association" are not interchangeable. 361 So.2d at 133-34. Were the present statute read as it seemingly was intended, rents deposited by the Association would be totally inaccessible to the lessor. The precise terms of the present statute need not be interrelated, however, since it impermissibly impairs the obligation of contracts even if the restricted withdrawal privilege were available.
[45] By contrast, the legislative intent in Blaisdell was spelled out in the statute, 290 U.S. at 416, 54 S.Ct. 231, and in the Women's Benefit Ass'n case, there were reports of the emergency conditions to document the legislative history and intended effect of the constitutional amendment at issue. 121 Fla. at 765-66, 164 So. at 858 (Buford, J., dissenting).
[46] § 83.60(2), Fla. Stat. (1977).
[47] § 83.61, Fla. Stat. (1977) (emphasis supplied).
[48] As the United States Supreme Court has observed:

The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.
Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245, 98 S.Ct. 2716, 2723 (1978).
[49] U.S.Const. art. I, § 10, cl. 1; art. I, § 10, Fla. Const.