# Supreme Court of Florida

————————

No. SC2023-1470

————————

**FLORIDA ATLANTIC UNIVERSITY BOARD OF TRUSTEES,**
Appellant/Cross-Appellee,

vs.

**HARBOR BRANCH OCEANOGRAPHIC INSTITUTE FOUNDATION, INC.,**
Appellee/Cross-Appellant.

December 4, 2025

COURIEL, J.

The Florida Constitution states that no "law impairing the obligation of contracts shall be passed." Art. I, § 10, Fla. Const. Harbor Branch Oceanographic Institute Foundation, Inc. (Foundation), a research institute affiliated with Florida Atlantic University (FAU), claims that the Legislature violated this guarantee when it adopted the Florida Excellence in Higher Education Act of 2018. Specifically, the Foundation says that the Act's requirement that all Foundation board members be approved by the FAU trustees unconstitutionally impairs a memorandum of

understanding (MOU) it negotiated with the university. The Foundation makes the same argument about a rule adopted by the Board of Governors of the State University System of Florida, which, the Foundation says, contravenes the same memorandum by reducing its control over its budget. After careful consideration, we conclude that neither of the contested provisions unconstitutionally interferes with the parties' agreement.

**I**

In Florida, a university direct-support organization is a non-profit corporation "[o]rganized and operated exclusively to receive, hold, invest, and administer property and to make expenditures to or for the benefit of a state university in Florida or for the benefit of a research and development park or research and development authority affiliated with a state university." § 1004.28(1)(a)2., Fla. Stat. (2025). In 2007, after experiencing financial trouble, the Foundation agreed in the MOU to become such an organization—a DSO—affiliated with FAU.

DSOs are highly regulated and, as the definition above suggests, exist for an exclusive, statutorily prescribed purpose. Section 1004.28 governs their use of university property and

facilities, giving each affiliated university oversight powers over a DSO's budget and board of directors, restricting its political activities, exempting it from public records requests, and prescribing financial audits. In exchange, DSOs get to use a university's property, facilities, and the work of its people. *See* § 1004.28(2)(b).

Relevant to this litigation, the MOU included the following provisions: "The [Foundation's] board of directors will have two (2) appointees from FAU"; and "Foundation distributions shall be made in the sole discretion of the [Foundation] Board of Directors to defray the expenses of its operations, to restore restricted corpus and retire debt, and to or for the benefit of [the Foundation at FAU] or FAU."

In 2009, the Florida Board of Governors (BOG) amended BOG Regulation 9.011(3).[1] The amendment required that DSO budgets

---

1. Under article IX, section 7 of the Florida Constitution, the Florida state university system is overseen and controlled by a BOG. "The board shall operate, regulate, control, and be fully responsible for the management of the whole university system." Art. IX, § 7(d), Fla. Const. As part of its oversight power, the BOG can adopt regulations. *See* § 1001.706(2), Fla. Stat. (2025). Current regulations govern state universities on matters such as

be "approved by the organization's governing board and the university board of trustees."[2]  In 2017, FAU took efforts to exercise control over the Foundation's budget.  It proposed to transfer all legal, communications, accounting, auditing, development, and staffing functions to FAU.  It also did away with the Foundation's CEO, defunding the position and replacing the CEO with FAU's Vice President for Research as the Foundation's president.

That led to this case.  Seeking clarity about its power to spend, in March 2017, the Foundation sought a declaratory judgment that FAU "is not permitted to impose its proposed budget on the Foundation, or any other budget that would substantially impair or destroy the Foundation's discretion to make distributions and ensure that its grants are properly administered and accounted

---

student admissions, tuition and fees, property and finance, and purchasing.  *See generally* State University System of Florida, Active Regulations (2025), https://www.flbog.edu/regulations/active-regulations.  Section 1004.28(2)(b), Florida Statutes, permits the BOG to adopt regulations for DSOs.  Under this authority, the BOG adopted BOG Regulation 9.011, which regulates DSOs.

2.  This regulation has since been renumbered to 9.011(4).  So, 9.011(4) refers to the amended BOG Regulation giving university boards of trustees approval power over DSO budgets.

for." While that matter was pending, the Florida Legislature passed the Florida Excellence in Higher Education Act of 2018. *See* ch. 2018-4, Laws of Fla. Relevant here is section 1004.28(3), Florida Statutes, which provides that the "university board of trustees shall approve all appointments to any direct-support organization not authorized by this subsection."[3] Pursuant to this statute, in May 2019, FAU told the Foundation to submit all board appointees for FAU consideration and approval. The Foundation refused.

In June 2019, FAU filed its own claim for declaratory judgment, asking the court to decide the budget dispute in its favor. FAU also asked the court for a declaration that section 1004.28(3) required the Foundation to submit its board appointees to FAU for approval.

The Foundation answered, asserting, as an affirmative defense, that amended section 1004.28(3) impaired its rights under the MOU in violation of article I, section 10 of the Florida Constitution. This provision states, in its entirety, that "[n]o bill of

---

3. There have been no relevant changes to the statute since 2018.

attainder, ex post facto law or law impairing the obligation of contracts shall be passed." Art. I, § 10, Fla. Const. The Foundation did not notify the attorney general or the state attorney that it raised this constitutional challenge to section 1004.28(3), even though Florida Rule of Civil Procedure 1.071 required it to do so.[4]

The trial court determined that both relevant provisions of the MOU contained latent ambiguities. In this context, "latent

---

4. This rule states:

> A party that files a pleading, written motion, or other document drawing into question the constitutionality of a state statute or a county or municipal charter, ordinance, or franchise must promptly
>
> (a) file a notice of constitutional question stating the question and identifying the document that raises it; and
>
> (b) serve the notice and the pleading, written motion, or other document drawing into question the constitutionality of a state statute or a county or municipal charter, ordinance, or franchise on the Attorney General or the state attorney of the judicial circuit in which the action is pending, by either certified or registered mail.
>
> Service of the notice and pleading, written motion, or other document does not require joinder of the Attorney General or the state attorney as a party to the action.

Fla. R. Civ. P. 1.071.

ambiguities are those which appear only as the result of considering extrinsic or collateral evidence that shows that a word, thought to have only a single meaning, actually has two or more meanings." 11 Samuel Williston & Richard A. Lord, *Williston on Contracts* § 33:43 (4th ed. 1993 & Supp. 2025).[5]

After a four-day trial, the trial court issued a final judgment. It determined that the MOU "limited FAU's involvement with the Foundation's board of directors to 2 appointees." It found that "[b]oth FAU and the Foundation clearly understood and agreed that FAU would not be entitled to have any other 'say-so' in the Foundation board membership." This finding led the trial court to conclude that amended section 1004.28(3) impaired the MOU. The trial court then stated that FAU "did not present any evidence

---

5. *See also GE Fanuc Intelligent Platforms Embedded v. Brijot Imaging Sys., Inc.,* 51 So. 3d 1243, 1245 (Fla. 5th DCA 2011) ("A latent ambiguity arises when the language in a contract is clear and intelligible, but some extrinsic fact or extraneous evidence creates a need for interpretation or a choice between two or more possible meanings." (citation omitted)). Parol evidence, that is, extrinsic evidence, "is admissible to explain a latent ambiguity." 11 *Williston on Contracts* § 33:43; *see also GE Fanuc,* 51 So. 3d at 1245 (explaining that when a contract has latent ambiguities, "the intent of the parties can be demonstrated with parol evidence"). So the trial court admitted parol evidence as to both issues.

regarding the purpose behind or justification for the 2018 amendment to Fla. Stat. § 1004.28," so FAU did not establish a "significant and legitimate public purpose" for the statute. Thus, the trial court found that FAU failed to show the statute "was 'enacted to deal with a broad, generalized economic or social problem' sufficient to outweigh the significant and severe impairment to the MOU."

As for the budget dispute, the trial court determined that inasmuch as the MOU did not contain a specific contractual agreement addressing approval of the Foundation's budget, there was no constitutional impairment of the MOU. It explained, "the Foundation budget was not the negotiated issue, the Foundation's 'to or for the benefit' expenditures to FAU (as required by the DSO Statute) was the specific negotiated issue contained within the MOU." So it found for FAU on that issue.

The Fourth District Court of Appeal affirmed, quoting at length from the lower court's decision and findings. *Fla. Atl. Univ. Bd. of Trs. v. Harbor Branch Oceanographic Inst. Found., Inc.*, 372 So. 3d 302, 307-10 (Fla. 4th DCA 2023). As to board appointments, the Fourth District concluded that amended section 1004.28(3)

- 8 -

"effectively rewrote the parties' contract by requiring the Foundation's board appointments to be approved by FAU." *Id.* at 308 (citing *Citrus Cnty. Hosp. Bd. v. Citrus Mem'l Health Found., Inc.,* 150 So. 3d 1102, 1108 (Fla. 2014)). The court then found "no error in the trial court's conclusion that FAU did not establish an interest outweighing the substantial impairment to the MOU." *Id.* As for budget approval, the Fourth District agreed with the trial court that the amended BOG regulation did not impair the MOU because the MOU did not contain an agreement addressing budget approval. *Id.* at 310. And in concluding, the Fourth District also noted, "[o]ur holding does not affect the Foundation's exclusive discretion to make distributions as provided in the MOU." *Id.* at 310-11. This appeal and cross-appeal followed.

**II**

Before arriving at the parties' disagreements about the MOU, we must address the fact that the Foundation did not comply with Florida Rule of Civil Procedure 1.071 when it filed this case. That rule provides, "[a] party that files a pleading, written motion, or other document drawing into question the constitutionality of a state statute . . . must promptly" do two things. It must "file a

notice of constitutional question stating the question and identifying the document that raises it"; and it must "serve the notice and the pleading . . . on the Attorney General or the state attorney of the judicial circuit in which the action is pending." Fla. R. Civ. P. 1.071.

The Foundation admits it did neither but contends that the requirements of the rule can be waived and that FAU and the attorney general did in fact waive those objections when they failed to raise them below. FAU and the attorney general disagree and cite our decision in *Lee Memorial Health System v. Progressive Select Insurance Co.*, 260 So. 3d 1038 (Fla. 2018), where we decided that the Second District Court of Appeal erred when it considered a constitutional challenge under the contracts clause because the party failed to serve the attorney general notice under rule 1.071.

On the facts of this particular case, the Foundation has the better of this argument. We conclude FAU waived any argument that the case could not proceed without notice to the attorney general when it requested that the trial court rule on the constitutional impairment issue. When a party "request[s] that the trial court determine the issue of the statute's constitutionality and

- 10 -

ignore[s] the requirement at the trial level, we [have found] it has waived the right to challenge the non-joinder [of the Florida Attorney General]." *State Farm Mut. Auto. Ins. v. Warren*, 805 So. 2d 1074, 1076 (Fla. 5th DCA 2002). It would be unfair to allow FAU to raise rule 1.071 now, given that it has previously asked for a ruling on the constitutional issue.

As to the attorney general, she was notified by the Foundation pursuant to Florida Rule of Appellate Procedure 9.425 while this matter was on appeal before the Fourth District. The attorney general neither filed any briefs nor argued before the Fourth District.

We need not and do not decide here that a party's failure to comply with rule 1.071 can always be excused by later conduct on appeal. Nor do we hold that any state litigant has the power to waive the attorney general's right to be heard pursuant to the rule. The attorney general certainly has authority to waive compliance with rule 1.071, and in this case gave every indication of having done so when this matter was before the Fourth District. In any event, because we ultimately find no constitutional violation, our decision today does not turn on rule 1.071.

Turning to the merits, FAU contends that the MOU does not limit FAU's ability to approve the Foundation's directors. The Foundation counters that a plain reading of the MOU cabins FAU's involvement with the Foundation's board to its two directors and nothing more.

The trial court and Fourth District both found that amended section 1004.28(3) unconstitutionally impaired the MOU. The Fourth District concluded that "[t]he Amended Statute effectively rewrote the parties' contract by requiring the Foundation's board appointments to be approved by FAU." *Harbor Branch*, 372 So. 3d at 308.

The constitutionality of a statute is a pure question of law that is subject to de novo review. *City of Miami v. McGrath*, 824 So. 2d 143, 146 (Fla. 2002). Similarly, "a matter of contract interpretation . . . is a question of law subject to de novo review." *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013) (citing *Chandler v. Geico Indem. Co.*, 78 So. 3d 1293, 1296 (Fla. 2011)).

Here, because the MOU does not speak to the approval of directors, section 1004.28(3) does not impair the obligations of the MOU.

**A**

Article I, section 10 of the Florida Constitution forbids impairing the obligations of a contract. When "assessing the validity of [a] Contracts Clause claim," the Court "begin[s] by identifying the precise contractual right that has been impaired and the nature of the statutory impairment." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504 (1987); *see also Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186-87 (1992) (holding that there was no need to "reach the questions of impairment" because "there was no contractual agreement regarding the specific . . . terms allegedly at issue").[6] Precision is important in this regard, for "we are obligated to accord legislative acts a presumption of

---

6. "We recognize that this Court, when construing a provision of the Florida Constitution, is not bound to accept as controlling the United States Supreme Court's interpretation of a parallel provision of the federal Constitution. Yet such rulings have long been considered helpful and persuasive, and are obviously entitled to great weight." *Pomponio v. Claridge of Pompano Condo., Inc.*, 378 So. 2d 774, 779 (Fla. 1979).

- 13 -

constitutionality and to construe challenged legislation to effect a constitutional outcome whenever possible." *Fla. Dep't of Revenue v. Howard*, 916 So. 2d 640, 642 (Fla. 2005).

Here, no contractual obligations have been impaired. The specific contractual provision at issue reads, "[t]he [Foundation's] board of directors will have two (2) appointees from FAU." No other provision of the MOU discusses board appointments, composition, or membership. From its face then, the MOU only discusses FAU's appointment of two directors. It says nothing about the extent of any party's discretion in making appointments, or whether the parties had an agreement as to the subsequent approval of board members. Section 1004.28(3), however, speaks of approval of DSO board members: "[t]he university board of trustees shall approve all appointments to any direct-support organization not authorized by this subsection."

Approval and appointment powers are distinct. For starters, the verbs "approve" and "appoint" are different. *Compare Approve*, *Black's Law Dictionary* (12th ed. 2024) (defining "approve" as "[t]o give formal sanction to; to confirm authoritatively"), *with Appoint*, *Black's Law Dictionary* (12th ed. 2024) (defining "appoint" as "[t]o

- 14 -

choose or designate (someone) for a position or job, esp. in government"). The distinction is familiar to readers of the U.S. Constitution. For example, as FAU points out, the President has the sole power to appoint principal officers, but presidential appointments must still be approved by the Senate through the confirmation process. *See* art. II, § 2, cl. 2, U.S. Const.; *see also Crumpacker v. Kansas, Dept. of Hum. Res.,* 474 F.3d 747, 754 n.7 (10th Cir. 2007) ("[I]t is indisputable that federal appointment power is vested in the President. The Senate's advice and consent power, exercised in the confirmation process, does not turn Presidential appointees into Senatorial appointees."). The same distinction appears in the Florida Constitution. *See, e.g.,* art. IV, § 9, Fla. Const. ("There shall be a fish and wildlife conservation commission, composed of seven members appointed by the governor, subject to confirmation by the senate for staggered terms of five years."). As this Court has held, the Florida Senate's approval power does not negate or undermine the Governor's appointment power. *See Advisory Op. to Governor,* 2 So. 2d 372, 375 (Fla. 1941) ("In creating an office to be filled by executive appointment, a provision of the statute that the appointment shall be confirmed by the Senate or

that the appointment shall be made by the Governor by and with the consent of the Senate is not unconstitutional, and such provision does not unduly restrict the Governor's discretion and judgment in exercising the executive power of appointment.").

Here, the MOU only speaks to FAU's appointment power; it says nothing about approval powers. The plain language of the MOU allows FAU to appoint two members to the board. It creates no other contractual rights regarding board appointments, composition, or membership. There is no ambiguity about other involvement with the board; there is merely silence. "Where a contract is simply silent as to a particular matter, courts should not, under the guise of construction, impose on the parties contractual rights and duties which they themselves omitted." *S. Crane Rentals, Inc. v. City of Gainesville*, 429 So. 2d 771, 774 (Fla. 1st DCA 1983) (citation omitted).

The Foundation turns to the negative implication canon for help—but it doesn't, here. That rule, also known as *expressio unius est exclusio alterius*, observes that "the expression of one thing implies the exclusion of others." *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*

- 16 -

107-11 (2012).  Under this canon, the Foundation contends, apart from FAU's two directors, the MOU prohibits FAU from having any further ability to approve or reject board appointees.

The negative implication canon "instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded."  *In re Celotex Corp.*, 487 F.3d 1320, 1334 (11th Cir. 2007) (citation omitted).  We, however, have warned that this canon "must be applied with great caution, since its application depends so much on context."  *Alachua Cnty. v. Watson*, 333 So. 3d 162, 172 (Fla. 2022) (quoting Scalia & Garner, *supra*, at 107).  This canon "properly applies only when the *unius* (or technically, *unum*, the thing specified) can reasonably be thought of as an expression of *all* that shares in the grant or the prohibition involved."  *Id.* (quoting Scalia & Garner, *supra*, at 107); *see also S. Coast Corp. v. Sinclair Ref. Co.*, 181 F.2d 960, 961 (5th Cir. 1950) ("The expression in a contract of one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been expressed.").  Similarly, the Supreme Court of the United States has explained that this canon "has force only when the items expressed are members of an

'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)). It "properly applies only when in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) (citation omitted).

So here, the canon is an odd fit. The provision giving FAU two board appointments does not naturally read as an expression governing all other participation in the board appointment process or shaping of the board, as the Foundation claims. These other matters related to board composition do not have such a "natural association of ideas in the mind of the reader" that the MOU's silence as to them demonstrates "deliberate choice, not inadvertence." *Id.* at 81; *Barnhart*, 537 U.S. at 168.

It is conceivable the canon could yield a reading of the MOU that would prohibit FAU from appointing more than two board members. But it would not "restrict[] FAU's participation in the

board appointment process to its selection of two members," or "create[] 'a prohibition to all other modes' of director appointment that would permit approval or rejection 'from FAU' as to the other members." Nor would it lead us to conclude the Foundation has the "right to appoint a majority of its board without interference from FAU" or the right "to shape its board."[7] Such assertions reflect the canon's use as an editorial device, rather than a guide to meaning. *See Haenal v. U.S. Fid. & Guar. Co.*, 88 So. 2d 888, 890 (Fla. 1956) ("[W]e 'cannot under the guise of construction make a new contract for the parties.' " (citation omitted)).

The Foundation's appeal to *Citrus County Hospital Board v. Citrus Memorial Health Foundation, Inc.*, 150 So. 3d 1102 (Fla. 2014), likewise fails to persuade. In that case, the special law at issue was a targeted rewrite of the contract between the parties. *See id.* at 1108. Here, as we have said, no provision of the MOU

---

7. In fact, the only way to know that two members constitute a minority of the Foundation's board is to look at extrinsic evidence, such as the Foundation's corporate governance documents. For the reasons we discuss above, the use of this extrinsic evidence is inappropriate. Further, there is nothing in the plain text of the MOU giving the Foundation a right to majority control of the board.

has been rewritten at all. Additionally, *Citrus County* must be read in light of the definition it gives for impairment: "to make worse; to diminish in quantity, value, excellency, or strength; to lessen in power; to weaken." *See id.* (quoting *State ex rel. Woman's Benefit Ass'n v. Port of Palm Beach Dist.*, 164 So. 851, 856 (Fla. 1935)). In other words, any additional obligations imposed by the special law not only rewrote the contract, but these obligations also worsened, diminished, lessened, or weakened the party's rights under the contract. By contrast, in this case, no right in the MOU has been worsened, diminished, lessened, or weakened by section 1004.28(3). Tellingly, the only diminishment, lessening, or weakening that the Foundation can point to is a diminishment of a purported right found nowhere in the MOU: the "ability to appoint a majority of the board." Furthermore, *Citrus County* does not use the balancing test articulated in *Pomponio*, which we find applicable here for reasons discussed below. *See Pomponio v. Claridge of Pompano Condo., Inc.*, 378 So. 2d 774, 780-82 (Fla. 1979).

The Foundation contends that, by virtue of section 617.0202(1)(d), Florida Statutes (2007), its bylaws and articles of incorporation became part of the MOU. That statute required that

- 20 -

a not-for-profit corporation's articles of incorporation "set forth . . . [a] statement of the manner in which the directors are to be elected or appointed." *See* § 617.0202(1)(d), Fla. Stat. (2007). In service of this argument, the Foundation points to the principle that "[t]he laws which exist at the time and place of the making of a contract enter into and become a part of the contract made, as if they were expressly referred to and incorporated in its terms." *Brandt v. Brandt*, 525 So. 2d 1017, 1020 (Fla. 4th DCA 1988) (quoting *S. Crane Rentals, Inc.*, 429 So. 2d at 772). The Foundation's articles of incorporation in 2007 (when the MOU was signed) provided for five board members. Since FAU only has two board appointees under the MOU, the Foundation concludes that these governing documents grant it the right to control a majority of the board, so FAU may not be involved whatsoever with the remaining three board members.

This argument fails because provisions that are included in a contract by operation of law are generally not subject to impairment analysis. "[C]onstitutional provisions against impairing the obligation of a contract do not apply to obligations imposed by the law without the assent of the party bound . . . ." *Fla. Sheriffs Ass'n*

*v. Dep't of Admin., Div. of Ret.*, 408 So. 2d 1033, 1035 (Fla. 1981) (citing *Anders v. Nicholson*, 150 So. 639 (Fla. 1933)).[8]

The Foundation argues that its right to appoint a board majority with no interference or involvement from FAU vested in 2007 as part of the MOU, so applying section 1004.28(3) to the MOU constitutes an impermissible retroactive application of the statute.

But again, the MOU says nothing about the Foundation having a board majority, or other FAU involvement with the board. Further, as FAU rightly points out, section 1004.28(3) only applies to future board appointments. As we stated in *Metropolitan Dade County v. Chase Federal Housing Corp.*, "a statute does not operate

---

[8] To the extent the Foundation's articles of incorporation and bylaws weigh in the balance, they tip it against the Foundation's argument. The articles say the Foundation is "operated exclusively to receive, hold, invest and administer property and to make expenditures to or for the benefit of [FAU or the Foundation at FAU], so far as is or may be permitted by the laws of the State of Florida." The Foundation binds itself to operate consistent with and under the laws of Florida. This makes sense given the Foundation's status as a DSO. "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) (quoting *Hudson Cnty. Water Co. v. McCarter*, 209 U.S. 349, 357 (1908)).

'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." 737 So. 2d 494, 499 (Fla. 1999) (citation modified); *see also Love v. State*, 286 So. 3d 177, 187 (Fla. 2019) (where statute "in no way 'attache[d] new legal consequences to events completed before its enactment,' " statute was not retroactive). Thus, section 1004.28(3) is not operating retroactively when applied to the Foundation.

**B**

We have traditionally considered the extent to which a statute impairs a party's contractual rights when giving effect to the promise of article I, section 10, of the Florida Constitution. In *Pomponio v. Claridge of Pompano Condo., Inc.*, 378 So. 2d 774 (Fla. 1979), we said "virtually no degree of contract impairment is tolerable in this state." *Id.* at 780 (citing *Yamaha Parts Distribs. Inc. v. Ehrman*, 316 So. 2d 557 (Fla. 1975)). Still, that principle "necessarily implies that some impairment is tolerable, although perhaps not so much as would be acceptable under traditional federal contract clause analysis." *Id.* "To determine how much

impairment is tolerable, we must weigh the degree to which a party's contract rights are statutorily impaired against both the source of authority under which the state purports to alter the contractual relationship and the evil which it seeks to remedy." *Id.*

"An impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." *Searcy, Denney, Scarola, Barnhart & Shipley v. State*, 209 So. 3d 1181, 1192 (Fla. 2017) (citing *Pomponio*, 378 So. 2d at 778-79). The question is "whether the nature and extent of the impairment is constitutionally tolerable in light of the importance of the state's objective, or whether it unreasonably intrudes into the parties' bargain to a degree greater than is necessary to achieve that objective." *Pomponio*, 378 So. 2d at 780. For example, in *Pomponio*, we addressed a challenge to a statute which provided for the deposit of rents into the registry of the court during litigation involving obligations under a condominium lease. *Id.* at 775. There, we first observed that the statute in question unquestionably impaired the landlord's contract because it deprived him of the current use of court-retained money in a manner that obviously was not bargained for. *Id.* at 780-81. On the other side of the

ledger, we explained, beyond general appeals to the state's police power, the specific objectives for the statute were "neither expressly articulated nor plainly evident from a reading of the statute." *Id.* at 781. In such circumstances, we held that "the balance between the state's probable objectives and its method of implementation, on the one hand, and the degree of contract impairment inflicted in furtherance of its policy, on the other, favors preservation of the contract over this exercise of the police power." *Id.*

Turning to this case, the relevant interests weigh in favor of FAU. The contract at issue here is not a contract between two private corporations. Rather, DSOs exist entirely to benefit state universities. They are statutorily required to be "[o]rganized and operated exclusively" for the "benefit" of these universities. *See* § 1004.28(1)(a)2. In order to use "property, facilities, and personal services at any state university," they must submit to regulation by both the BOG and their university's board of trustees. *See* § 1004.28(2)(b). These regulations include "budget and audit review and oversight by the board of trustees, including thresholds for approval of purchases, acquisitions, projects, and issuance of debt." *Id.* A university also has significant control over DSO leadership,

with "at least one representative [on] the board of directors and the executive committee." § 1004.28(3). The university president "shall also serve on the board of directors and the executive committee." *Id.* And, of course there is the provision at issue here, mandating that the "university board of trustees shall approve all appointments." *Id.* DSOs are also subject to audit by state entities: "The Board of Governors, the university board of trustees, the Auditor General, and the Office of Program Policy Analysis and Government Accountability shall have the authority to require and receive from the organization or from its independent auditor any records relative to the operation of the organization." § 1004.28(5)(a).

Given this statutory framework, it is no surprise that we, and other courts, have recognized the close relationship between DSOs and the state. In *Plancher v. UCF Athletics Association*, we held that the UCF Athletics Association, a DSO for the University of Central Florida, was entitled to limited sovereign immunity as a "corporation[] primarily acting as an instrumentalit[y] or agenc[y] of the state." 175 So. 3d 724, 726 (Fla. 2015) (quoting § 768.28(2), Fla. Stat. (2008)). Similarly, multiple federal courts have held that

- 26 -

DSOs are protected by Eleventh Amendment immunity, which protects "state officers and entities" from "the suit of an individual without [the state's] consent" "when they act as an 'arm of the state.' "[9]  The Legislature thus has an obvious interest in regulating and providing oversight over DSO leadership and finances.

We do not seek and do not weigh specific evidence of any legislator's intent in amending section 1004.28(3).  While the "specific objectives" of a statute can be "expressly articulated," such objectives can also be "plainly evident from a reading of the statute." *Pomponio,* 378 So. 2d at 781.  As set forth above, such is

---

9.  *See Souto v. Florida Int'l Univ. Found., Inc.,* 446 F. Supp. 3d 983, 990 (S.D. Fla. 2020) ("[T]he relevant case law uniformly holds that DSOs are arms of the state for Eleventh Amendment immunity purposes . . . ."); *see also Baker v. Univ. Med. Serv. Ass'n,* No. 8:16-CV-2978-T-30MAP, 2016 WL 7385811, at *3 (M.D. Fla. Dec. 21, 2016) (finding that "Florida law defines [University Medical Services Association, a DSO of the University of South Florida] as an arm of the state"); *Univ. of Florida Research Found., Inc. v. Medtronic PLC, Medtronic, Inc.,* No. 1:16CV183-MW/GRJ, 2016 WL 3869877, at *2, *3 (N.D. Fla. July 15, 2016) (holding that the University of Florida Research Foundation, a DSO for the University of Florida, "is controlled by the state" and "an arm of the state" and thus entitled to Eleventh Amendment immunity); *Elend v. Sun Dome, Inc.,* No. 8:03-CV-1657-T-TGW, 2005 WL 8145752, at *5 (M.D. Fla. Dec. 22, 2005) (Wilson, Mag. J.) (holding that Sun Dome, a DSO of the University of South Florida, was entitled to Eleventh Amendment immunity and noting that under Florida law, Sun Dome was "a not-for-profit corporation . . . controlled by the university").

the case here. Thus, we have assessed "the balance between the state's *probable objectives* and its method of implementation, on the one hand, and the degree of contract impairment inflicted in furtherance of its policy, on the other." *Id.* (emphasis added).

To the extent that section 1004.28(3) impairs the MOU at all, that impairment is no greater than necessary to achieve these public interests. The statute does not "unreasonably intrude[] into the parties' bargain to a degree greater than is necessary to achieve" the objective of state oversight over DSOs. *See id.* at 780.

Section 1004.28(3) does not unconstitutionally impair the obligations of the MOU.

**IV**

Turning next to the Foundation's cross-appeal, we agree with the lower courts that BOG Regulation 9.011(4) does not impair the MOU.

The MOU does not speak to budgets, only distributions. A budget is a "statement of an organization's estimated revenues and expenses for a specified period, usu. a year," whereas a distribution is merely the "act or process of apportioning or giving out."

*Compare Budget, Black's Law Dictionary* (12th ed. 2024), *with*

*Distribution, Black's Law Dictionary* (12th ed. 2024).

As FAU points out, the distinction between the authority to approve budgets and the discretion to distribute funds is frequently made with respect to public monies. For example, in *Alachua County v. Watson*, we held that a county's power to set forth the Sheriff's budget at the object level was "not in derogation of the Sheriff's constitutional independence" or of the Sheriff's independence "concerning the purchase of supplies and equipment, selection of personnel, and the hiring, firing, and setting of salaries of such personnel." 333 So. 3d at 167, 170 (citation omitted).

This case is different in that the Foundation retains an independence from FAU and the State that was not present in *Alachua County.* Still, the power to approve budgets is distinct from the discretion to distribute funds. And while a budget may have a downstream effect on distributions, that does not make them the same. Nor does FAU's approval authority over the Foundation's budget take away the Foundation's ability to apportion or give out endowment funds within the contours of that budget.

Accordingly, BOG Regulation 9.011(4) does not unconstitutionally impair the MOU. As with approval of board members, the MOU is simply silent as to budgets and budget approval powers. No contractual obligation is impaired.

Even if the budget approval power did impair the Foundation's contractual right over distributions, the interests that our cases instruct us to consider favor FAU here. As already noted, DSOs are highly regulated. The state has a strong interest in ensuring that DSOs are receiving, holding, investing, and administering their finances and making their expenditures "to or for the benefit of a state university." *See* § 1004.28(1)(a)2. Budgetary approval is a reasonable means of effectuating this interest, and it is not "a degree greater than is necessary to achieve [this] objective." *Pomponio*, 378 So. 2d at 780.

## V

We reverse the Fourth District as to the board appointments issue and otherwise affirm.

It is so ordered.

LABARGA, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
MUÑIZ, C.J., concurs specially with an opinion, in which
CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

MUÑIZ, C.J., concurring specially.

I concur in the judgment and in the parts of the majority opinion holding that any contractual impairment caused by the Florida Excellence in Higher Education Act of 2018 and by Board of Governors Regulation 9.011(3) (as amended in 2009) is permissible under the Florida Constitution's Contracts Clause.

I am not as sure as the majority that, under our Court's precedent, the Act and the Regulation did not impair the contract between the Foundation and the University. In *Citrus County Hospital Board v. Citrus Memorial Health Foundation, Inc.*, 150 So. 3d 1102 (Fla. 2014), we found an impairment when a new statute required one of the contracting parties "to comply with public accountability and financial responsibility measures that [were] mentioned nowhere in the parties' agreements" and that went beyond the legal requirements in place when the contract was formed. *Id.* at 1108. That essentially describes what happened here, too.

Nonetheless, as the majority explains, post-*Citrus County* our Court has acknowledged that "[a]n impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." *Searcy, Denney, Scarola, Barnhart & Shipley v. State*, 209 So. 3d 1181, 1192 (Fla. 2017). The permissibility of an impairment depends in part on the extent to which a new law disrupts a party's reasonable expectations under the contract. *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020). "And the reasonableness of expectations depends, in part, on whether legislative action was foreseeable, and this, in turn, is affected by whether the relevant party operates in a heavily regulated industry." *Id.* Under these standards, any contractual impairment caused by the Act and the Regulation is constitutionally permissible.

At the time it agreed to become a DSO, the Foundation could not have reasonably expected that its arrangement with the University would trump subsequent changes to laws and regulations governing the relationship between universities and DSOs generally. The Foundation signed up to become an entity whose animating purpose (as a DSO) would be to hold and spend

- 32 -

money exclusively for the benefit of its sponsoring school. § 1004.28(1)(a)2., Fla. Stat. (2007). As of 2007, universities already were guaranteed seats on a DSO's board, and DSOs were subject to financial oversight by their sponsoring universities. § 1004.28(3), (5), (7). The changes effected by the Act and the Regulation, which apply across-the-board to all DSOs, incrementally and foreseeably built on the oversight structure already mandated by law in 2007. And, given the large sums of money that DSOs hold and spend on behalf of our state universities, the importance of the state's interest in facilitating effective oversight of DSOs is self-evident.

For these reasons, I agree with the majority's ultimate disposition of this matter.

CANADY, J., concurs.

An Appeal from the District Court of Appeal
Statutory or Constitutional Invalidity

Fourth District – Case No. 4D2022-0313

(St. Lucie County)

Andy Bardos and Ashley H. Lukis of GrayRobinson, P.A., Tallahassee, Florida, and Jack R. Reiter of GrayRobinson, P.A., Miami, Florida,

for Appellant/Cross-Appellee

Joseph G. Galardi and Scott W. Atherton of Atherton Galardi Mullen & Reeder PLLC, West Palm Beach, Florida; and Stuart H. Singer, Sashi C. Bach, Jesse Panuccio, and Lauren E. Amos of Boies Schiller Flexner LLP, Fort Lauderdale, Florida,

    for Appellee/Cross-Appellant

James Uthmeier, Attorney General, Jeffrey Paul DeSousa, Acting Solicitor General, and Robert Scott Schenck, Assistant Solicitor General, Office of the Attorney General, Tallahassee, Florida,

    for Amicus Curiae Attorney General